MELVIN H. KEPPLER, as Administrator, etc., of FREDERICK A. KEPPLER, Deceased, Respondent, v. THE NEW YORK CENTRAL RAILROAD COMPANY, Appellant.

Third Department, January 7, 1942.

*Whalen, McNamee, Creble & Nichols* [*Charles E. Nichols* of counsel], for the appellant.

*Wilson & Connor* [*William E. J. Connor* and *William M. Eaton* of counsel], for the respondent.

CRAPSER, J. The action is brought under the Federal Employers' Liability Act to recover damages for the death of the plaintiff's intestate, employed by the defendant as a fire patrolman, which occurred on May 25, 1939, at two-five P. M., when he was struck and instantly killed by a train at Stever's Crossing between Craryville and Philmont while sitting upon a velocipede.

The complaint alleged many acts of negligence. The case was submitted to the jury upon the question of whether or not the defendant was guilty of any negligence which was the proximate cause of the accident. The main question presented to them was whether or not a sufficient warning of the approach of the train was given to the plaintiff's intestate; whether or not the train was operated at an excessive rate of speed and the failure of the engineer to stop after he became aware of the peril of the deceased.

The Harlem Division of the defendant's railroad, extending from New York city to Chatham in Columbia county, is a single-track railroad, and at the place of the accident extends in a southerly and northerly direction. It crosses a country highway, running substantially east and west, at Stever's Crossing which is located 1.38 miles south of Philmont and 5.79 miles north of Craryville.

Approaching the crossing from the south the track is on a down grade for a distance of at least 1,600 feet. South of the crossing the track passes through a rock cut, on a left-hand curve going north, entirely obstructing the view of the crossing until a point is reached 430 feet south of the crossing, from which point it can first be seen. The curve commences 600 feet south of the crossing and extends 400 feet north of it.

At the northeast side of the crossing there is located an electric crossing bell which rings automatically when a north-bound train reaches the circuit about 2,500 feet south of the crossing.

The deceased had been employed by the defendant as a section hand for about ten years, and during the months of April and May of those years, excepting 1935, he was employed as a fire patrolman between Philmont and a point about one mile north of Craryville, a total distance of about six miles. His duties as a fire patrolman

were to follow steam trains and to extinguish any fires that might occur along the right of way. He was furnished with a velocipede with which to patrol the track. This consisted of a vehicle weighing 150 pounds with three wheels. It was operated by pumping with the hands and feet. The seat was located over the rail upon which the two wheels ran, the third wheel running on the opposite rail.

On the day of the accident south-bound train No. 22 left Philmont at one-forty-four P. M., according to the time table, a copy of which had been furnished to the deceased, and was scheduled to meet train No. 79, a north-bound train, at Craryville which was located 7.17 miles south of Philmont.

Just as train No. 22 was departing from the Philmont station and the deceased was at the ticket window in the waiting room the station agent asked him, " Where are you going? " and the deceased said, " I am going to head for Craryville," and the station agent said, " You haven't any time to go to Craryville, my boy; it is late; 22 and 79 are meeting at Craryville; you had better stay here." The deceased said, " To hell with 79, I can go to Stever's," and at that he went out the door and onto the track and he left a minute or two after train No. 22 had left and followed 22 south.

Another fire patrolman, who was cutting brush, saw No. 22 go south and he saw the deceased on his velocipede going ten or twelve miles an hour three or four minutes behind it. The deceased was also seen by a farmer going south towards Stever's Crossing. In about fifteen minutes the farmer heard blasts of a whistle and saw the train going north to Philmont. He did not hear or see the accident but was called to the scene of the accident by the conductor and saw the body of the deceased lying ninety feet north of the crossing on the west side of the track.

Train No. 22, south bound, was seven minutes late leaving Philmont, and was seven minutes late when it arrived at Craryville.

Train No. 79, a single unit rail motor car, known as " M9," propelled by a gasoline motor, the crew consisting of an engineer and a conductor, was scheduled to leave Craryville, north bound, as soon as train No. 22 passed that station. It was scheduled to leave at one-forty-eight but did not leave until one-fifty-seven P. M. As it approached Stever's Crossing it came to a whistling post 1,367 feet south of the crossing where the engineer turned on the bell operated automatically by air and at the whistling post commenced to sound the whistle. He blew two long and one short blasts and was about to blow the last short blast when he saw the velocipede on the crossing. He was then coming around the curve, through the rock cut, and was 350 to 400 feet from the crossing. He applied the brakes in emergency, opened the sand and continued to sound short

blasts on the whistle. A man was sitting on the velocipede over the left or west rail, with his arm on the handle and his head down on his arm. The man never moved and the brakes were applied fully when he first saw the object on the crossing. The deceased was struck and thrown to the left and instantly killed. The train came to a stop 600 feet north of the crossing and backed up to the crossing where the body of the deceased was found west of the track about ninety feet north of the crossing.

The custom and practice among fire patrolmen was to remove the velocipede when trains came along and to keep out of the way of trains moving in both directions. They did not have any train orders but followed the trains and looked out for other trains.

The rules required fire patrolmen to protect themselves against the dangers of train movements. This was known to the deceased because he had been a fire patrolman for a number of years and had taken a written examination in the rules in March of 1939. The station agent at Philmont had given him the information about the operation of the trains and that train No. 79 would be coming from Craryville to Philmont as soon as train No. 22 arrived at Craryville. He knew that train No. 22 would arrive at Craryville long before he could arrive there and he was warned by the station agent at Philmont not to go out but to wait there but he said that he could make Stever's Crossing.

The case of *Chesapeake & Ohio R. Co.* v. *Nixon* (271 U. S. 218) holds that where a section foreman, whose duty it was to inspect and repair the track, was permitted by the railroad to use a velocipede in going to work, he assumed the risk of injury by trains, and was required to rely on his own watchfulness to keep out of the way; the rule being the same as if he was actually engaged in his work of inspecting the track.

" For reasons that the jury found insufficient to excuse the omission, the engineer and fireman of the train were not on the lookout, and the question raised is whether as toward the deceased the defendant owed a duty to keep a lookout, or whether on the other hand the deceased took the risk." It was held that the risk was assumed by the deceased. (*Chesapeake & Ohio R. Co.* v. *Nixon, supra; Carfelo* v. *Delaware, L. & W. R. Co.*, 54 F. [2d] 475.)

The bell and whistle had been sounded for the crossing before the engineer could possibly have seen the deceased upon the track and he testified that from the time he saw him he continued to blow short blasts on the whistle. There was one passenger on the train, a Mrs. Smith. She testified that she did not know whether the whistle was blown but the evidence in the case clearly establishes that the whistle was blown at the whistling post.

The engineer and conductor testified that the train was going about fifty miles an hour. Mrs. Smith, the only passenger on the train, testified that it was going pretty fast and she thought sixty miles an hour. The rate of speed had been fixed by the railroad company at the place where the accident happened at fifty miles an hour.

From Craryville to the crossing is 5.79 miles. Train No. 79 left Craryville at one-fifty-seven P. M. and the accident happened at two-five P. M. The train consumed eight minutes in traveling 5.79 miles which is an average rate of speed of 43.42 miles per hour. The train slowed down some for Martindale but did not stop. The train was operating at an average speed of less than fifty miles an hour.

The greatest distance at which the engineer could see the crossing was 430 feet. He testified that he was 350 to 400 feet from the crossing when he saw the velocipede on the east or right-hand rail. As he went around a left-hand curve he saw a man sitting over the west or left rail with his arm on the handle and his head down on his arms. He applied his emergency brake as soon as he saw the deceased and continued to blow his whistle up to the crossing. The train did not come to a stop until it was somewhere from 600 to 800 feet north of the crossing. There was no evidence that the train could have been more quickly stopped going at a rate of speed of fifty miles an hour.

The court cannot take judicial notice of the length of time within which a train can be stopped under a given set of facts; such testimony can only be supplied by experts or other witnesses who have had experience in the stopping of trains.

From the time the engineer could see the man on the track some time would naturally elapse before he could apply his brakes. If the train was proceeding at fifty miles an hour he would be going seventy-five feet a second. He had had no occasion to apply his brakes before he saw the man on the track; whatever time it took him to act afterwards, the train was still moving perhaps as fast as seventy-five feet a second and in the absence of evidence that the train could have been sooner stopped there was no question for the jury as to the negligence of the engineer. (*Albrecht* v. *Rochester, S. & E. R. R. Co.*, 205 N. Y. 230.)

The plaintiff failed to show negligence on the part of the railroad and the deceased had assumed the ordinary and necessary risks of his employment; it was his duty to keep out of the way of trains.

The order and judgment appealed from should be reversed and the complaint dismissed.

BLISS, SCHENCK and FOSTER, JJ., concur; HILL, P. J., dissents.

HILL, P. J. (dissenting). The jury found the intestate twenty-five per cent and the railroad and its other employees seventy-five per cent at fault. If the intestate had waited until train No. 79 reached Philmont, he would have been more than thirty minutes behind train No. 22, and in thirty minutes a fire could make considerable headway. His duty was to put out fires while they were in an incipient stage. The engineer or motorman on No. 79 knew that Keppler was not far behind train 22 and with that knowledge was required to exercise a high degree of care to observe the rules. The intestate assumed the risk incident to his employment but nothing in addition. The jury were justified in drawing the conclusion that under the circumstances when the accident happened the train was traveling at an execessive rate of speed and that proper signals were not given.

Order and judgment appealed from reversed and the complaint dismissed.