JOSEPH MURRAY, an Infant, by WILLIAM MURRAY, his Father and Natural Guardian, et al., Respondents, v JOHN DONLAN, JR., an Infant, by JOHN DONLAN, SR., his Father and Natural Guardian, et al., Appellants, and LONG ISLAND RAILROAD COMPANY, Respondent.

Second Department, November 17, 1980

APPEARANCES OF COUNSEL

*A. Paul Goldblum* for appellants.

*Julien, Schlesinger & Finz, P.C. (Leonard L. Finz* and *David Jaroslawicz* of counsel), for respondents.

*Thomas M. Taranto (J. Dennis McGrath* and *Paul J. Donnelly, Jr.* of counsel), for respondent.

338

MANGANO, J.

 Two main issues are raised on this appeal: (1) whether a motor vehicle accident report prepared by a non-eyewitness police officer may be admitted into evidence for the purpose of establishing the cause of the subject accident, and (2) whether judicial notice may be taken of the purported fact that an automobile equipped with good brakes and traveling 10 to 12 miles per hour can be stopped in considerably less than 15 feet. We answer both of these questions in the negative.

On December 22, 1969 defendant John Donlan, Jr. was driving plaintiffs Joseph Murray, Paul Mott, Jr. and Donald Coons home from a high school swimming practice when the car he was operating struck a westbound Long Island Railroad train at its Hulse Road crossing in East Setauket, Long Island. The three plaintiffs passengers were all allegedly injured.

Consequently, the instant action was commenced against John Donlan, Sr., as the owner of the motor vehicle in which the plaintiffs passengers were injured, and John Donlan, Jr., as the operator. In the same action, plaintiffs also named the Long Island Railroad Company (the railroad) as a defendant.

In their complaint plaintiffs alleged that on the day in question defendant John Donlan, Jr. had been driving his father's car in excess of the legal speed limit, or, at least, in excess of that speed which care and caution would have dictated under the circumstances. As and against the railroad it was alleged that its Hulse Road crossing had knowingly been permitted to remain in a state of disrepair, creating a hazardous condition for motorists.

All three defendants denied most of the allegations in the complaint. Nevertheless, the railroad cross-claimed against its codefendants charging that if plaintiffs had in fact sustained injuries, as alleged, those injuries were due solely to the negligence of John Donlan, Sr. and John Donlan, Jr.

At trial, plaintiff Paul Mott, Jr. testified that on December 22, 1969 he had been riding in the front right seat of

the Donlan automobile prior to the accident at the railroad crossing on Hulse Road. He had glanced at the car's speedometer and had observed it registering 50 to 55 miles per hour. He had been able to see this even though the vision in his left eye is impaired, a condition only partially corrected by wearing a contact lens. In further testimony Mott described the approach to the railroad crossing as having been obscured on the right by trees, so high and thick that one could not see through them to the tracks.

Plaintiff Donald Coons, another passenger in the Donlan automobile, testified on cross-examination that at all times prior to the accident on Hulse Road the car's speed had been approximately 35 to 40 miles per hour. He admitted that before the accident he had not seen the train with which the car had collided and confirmed that there had been dense woods to the right of the road near the railroad crossing.

The third passenger, plaintiff Joseph Murray, testified that he had no independent recollection of the automobile accident of December 22, 1969. He was completely unable to furnish any meaningful details concerning the accident, the events leading up to it or the circumstances and conditions surrounding it.

Considerable testimony was adduced regarding the hazardous nature of the railroad crossing at Hulse Road. There was evidence, consistent with the testimony of infant plaintiffs Mott and Coons, that to the right of the crossing there had been dense woods. This condition, in conjunction with the curve and decline of the road at this point, caused one witness to observe that the crossing was almost a blind intersection. It was estimated that at the time of the accident the railroad tracks could only have been visible to motorists within a range of 20 to 25 feet.

Four other witnesses testified about complaints being made to the railroad by local civic groups concerning the danger posed by the Hulse Road crossing. A response by the railroad was admitted into evidence showing that representations had been made that appropriate warning devices would be installed at that location.

Testimony produced by the railroad confirmed that the crossing bordered on a wooded area, elevated above the

tracks. This terrain's effect on visibility, however, was minimized by the railroad.

Emphasizing the evidence concerning the dangerous condition of the Hulse Road crossing, defendants John Donlan, Sr. and John Donlan, Jr. contended that if plaintiffs had sustained any injuries in the accident of December 22, 1969, they were not due to the negligence of John Donlan, Jr. The latter acted with all reasonable care, but was a victim of unforeseeable circumstances, viz., the hazardous condition of the crossing, for which the railroad was responsible.

John Donlan, Jr. testified that on the date of the accident there had been a moderate to heavy rainfall throughout the day. He described the crossing as wet and sandy, and explained how it declined by a 15 degree angle at this point. He also described the positions of the railroad warning signs, the location of the woods near the crossing and the obscured visibility of the railroad tracks. The infant defendant claimed that on the day in question he had only observed one speed limit sign on the route he was traveling. It had been on Sheep Pasture Road, approximately one-quarter of a mile before the crossing. The posted speed limit had been 30 miles per hour.

Finally, John Donlan, Jr. testified that his general speed just prior to the accident had been 30 miles per hour, and that as he approached the Hulse Road crossing he had slowed down to between 25 and 30 miles per hour.

On the critical issue of the speed of the Donlan car, plaintiffs, in addition to their own testimony, presented that of Police Officer Charles Colan. They also produced a motor vehicle accident report prepared by the officer.

Colan testified that after having arrived at the scene of the accident he had interviewed several witnesses, one of whom was John Donlan, Jr.[1] According to the officer, the substance of young Donlan's remarks was: "that he [Donlan, Jr.] saw the train at the last minute, braked his vehicle, but was unable to stop and collided with the train

---

1. There was some confusion in the officer's testimony on this point. He initially stated that he had not spoken with the operator or passengers of the Donlan car. And yet, he later recalled a conversation with the infant defendant.

* * * He said he braked his vehicle, which skidded and collided with the train."

These and other comments by eyewitnesses formed the basis of the accident report that was admitted into evidence over the vehement objection of defendants John Donlan, Sr. and John Donlan, Jr. The principal reason for this objection was that the report included the following statement regarding the operation of the Donlan car as a contributing factor in the resulting accident: *"Speed too fast * * ** Failing to yield right of way to vehicle. (Emphasis added.)[2] This statement was challenged as rendering the accident report conclusory in nature and violative of the hearsay rule. The trial court, though finally conceding that the report may have contained conclusions, held it admissible since any such conclusions may have been based upon informants' statements at the scene.

The issue of the speed of the Donlan car was, of course, discussed in the trial court's charge to the jury. The Judge, in his instructions, quoted subdivision (a) of section 1180 of the Vehicle and Traffic Law as requiring that " '[n]o person shall drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing.' " He then advised the jury: "The Court has been asked to take judicial notice, and the Court will, and so charges you that automobiles equipped with good brakes traveling 10 to 12 miles per hour can be stopped in considerably less than 15 feet." The court then went on to say that in order to find any negligence in this case all of the surrounding conditions and circumstances existing at the time of the accident should be considered.

After due deliberation on the issue of liability only, the jury found in favor of the plaintiffs as against defendants John Donlan, Sr. and John Donlan, Jr. and in favor of the defendant railroad as against the plaintiffs. Based upon this verdict, judgment was entered from which this appeal is now taken by the Donlans.

---

2. This statement resulted from Officer Colan checking the boxes on the accident report form opposite two choices in a preprinted list of potential causes of motor vehicle accidents.

## I

The first issue raised on appeal is whether the police accident report of Officer Charles Colan was improperly admitted into evidence at the trial. The appellants contend that it was, and challenge its admission in that the report consisted of, or, at least, contained, both hearsay statements and statements of a conclusory nature.

## A

Initially, we turn to the question of hearsay and whether the police accident report was admissible as a business record under the statutory exception to the hearsay rule (see CPLR 4518).

The general definition of New York's business record hearsay exception can be found in CPLR 4518 (subd [a]), which substantially embodies the provisions of section 374-a of the former Civil Practice Act (see Sixth Report to the Legislature by the Senate Finance Committee relative to the Revision of the Civil Practice Act, NY Legis Doc, 1962, No. 8, pp 403-404). That former section of the law had replaced four common-law rules that had been devised by the courts for the receipt into evidence of reliable business entries otherwise inadmissible as hearsay (Richardson, Evidence [10th ed, Prince], § 293, p 265; 5 Weinstein-Korn-Miller, NY Civ Prac, par 4518.03, pp 45-398 — 45-399). Those rules were: (1) the parties' shop-book doctrine, (2) the regular entries rule, (3) the rule regulating the use of memoranda to refresh present memory, and (4) the doctrine of past recollection recorded (5 Weinstein-Korn-Miller, NY Civ Prac, par 4518.03, pp 45-398 — 45-399; see, also, Richardson, Evidence [10th ed, Prince], §§ 294-296, pp 265-270, and cases cited therein). Enacted to replace these former rules, to overcome their deficiencies, and to liberalize their narrow and strict requirements *(Publishers' Book Bindery v Ziegelheim*, 184 Misc 559, 560), section 374-a of the former Civil Practice Act was intended "to eliminate the necessity of calling a large number of employees who participated in making entries in the business records" *(Harsco Corp. v Rodolitz Realty Corp.*, 61 Misc 2d 644, 648). Essentially, therefore, it was designed to

meet problems encountered by commercial enterprises engaged in litigation (see 5 Weinstein-Korn-Miller, NY Civ Prac, par 4518.02, p 45-396). Nevertheless, the subsequent application of the business record exception under both the Civil Practice Act and the CPLR was, and continues to be, liberally extended to cover a variety of writings and records (see 22 NY Jur, Evidence, § 530, and cases cited therein).

With such a broad application of the statutory rule, its limits were soon tested. As early as 1930, two years after enactment, the Court of Appeals in *Johnson v Lutz* (253 NY 124) considered section 374-a in reference to police accident reports.

In that case plaintiff sought to recover damages for the wrongful death of her intestate, who was killed when his motorcycle collided with the defendants' truck. A police accident report was offered in evidence by the defendants under section 374-a. The report was excluded and defendants, on appeal from the judgment, raised only one issue, i.e., that this evidentiary ruling was erroneous.

The Court of Appeals held (pp 127-128) : "The memorandum in question was not made in the regular course of any business, profession, occupation or calling. The policeman who made it was not present at the time of the accident. The memorandum was made from hearsay statements of third persons who happened to be present at the scene of the accident when he arrived. It does not appear whether they saw the accident and stated to him what they knew, or stated what some other persons had told them." The court construed the statute as (p 128) : "permit[ting] a writing or record, made in the regular course of business, to be received in the evidence without the necessity of calling as witnesses all of the persons who had any part in making it, provided the record was made as a part of the duty of the person making it, or on information imparted by persons who were under a duty to impart such information." Thus, under *Johnson*'s definition of "a writing * * * made in the regular course of business", memoranda would not be included if based upon information derived from third parties whose communications were casually and voluntarily made and not pursuant to a business duty

or obligation. Consequently, a recorder may be under a business duty to record information supplied to him, while his informant is not duty bound to supply that information. If so, a writing created as a result of such a transaction would not be admissible in evidence as a hearsay exception under the statutory business record rule (see *Hayes v State of New York*, 50 AD2d 693, affd 40 NY2d 1044; *Prado v Onor Oscar, Inc.*, 44 AD2d 604).

In *Johnson v Lutz (supra)* the specific writing in question was a police accident report prepared by a noneyewitness police officer. It, therefore, would seem controlling in the case at bar. And yet, an argument has been made that the *Johnson* holding has been subsequently qualified, limited, and even abandoned. We reject this argument.

Our attention is drawn to *Kelly v Wasserman* (5 NY2d 425). In that case plaintiff, a 65-year-old woman, could not maintain the house she owned. Defendant agreed that if plaintiff would convey the property to him, he would pay all her debts and allow her to live in two rooms on the premises, rent free. Plaintiff claimed that the rent-free occupancy was for life. Defendant contended that it was only for as long as the Department of Housing and Buildings permitted. The agreement was never reduced to writing. Thereafter, under pressure from the Department of Housing and Buildings, defendant brought a summary proceeding to evict plaintiff. Plaintiff, in turn, brought an action to have the deed reformed to include a provision for her life tenancy. After consolidating both matters, plaintiff's action was dismissed after trial and she was ordered evicted.

Plaintiff was a welfare recipient. There existed in her case file certain memoranda of conversations between Department of Welfare personnel and defendant. In those memoranda, defendant was recorded as having said that plaintiff could occupy the premises rent free for life. This evidence was excluded at trial.

The Court of Appeals, citing *Johnson v Lutz* (253 NY 124, *supra*), held that since the welfare department had a duty to record the information communicated by defendant, section 374-a of the Civil Practice Act would permit its

records to be admitted into evidence. This holding clearly ignored the full impact of the decision in *Johnson v Lutz (supra)*. Admittedly, the welfare department was under a business duty to record defendant's statements. However, the second requirement of *Johnson*, viz., the business duty of the informant to impart information, was not discussed, nor even mentioned by the court in *Kelly v Wasserman (supra)*.

The holding in *Kelly v Wasserman (supra)* was followed in *Zaulich v Thompkins Sq. Holding Co.* (10 AD2d 492), *Chemical Leaman Tank Lines v Stevens* (21 AD2d 556), and *Penn v Kirsh* (40 AD2d 814).

Recognizing the importance of reconciling these decisions with *Johnson v Lutz (supra)*, the Appellate Division, Third Department, laid down the following guidelines, making them specifically referable to police reports in accident cases: "Subdivision (a) of CPLR 4518 permits a police report to be admitted as proof of the facts recorded therein if (1) the entrant of those facts was the witness, or (2) the person giving the entrant the information was under a business duty to relate the facts to the entrant *(Johnson v Lutz, supra)*. If neither of these two requisites is satisfied but the report recites a statement of an outsider, the record may be admitted (under *Kelly v. Wasserman, supra)*, to prove that the statement recorded therein was made by the outsider (even though the main facts set forth in the business record are hearsay and excludable pursuant to *Johnson)* and, then, the facts recited in the statement may be proven by the business record if the statement qualifies as a hearsay exception, e.g., an admission, as in *Kelly* and *Chemical Leaman." (Toll v State of New York*, 32 AD2d 47, 49-50; see, also, *Wright v McCoy*, 41 AD2d 873; *Mahon v Giordano*, 30 AD2d 792; *Sinkevich v Cenkus*, 24 AD2d 903: *Yeargans v Yeargans*, 24 AD2d 280.)

In a recent opinion of the Court of Appeals, the holding in *Johnson v Lutz (supra)* and its interpretation by *Toll v State (supra)* were unquestionably reaffirmed.

"To constitute a business record exception to the hearsay rule, the proponent of the record must first demonstrate that it was within the scope of the entrant's business duty

to record the act, transaction or occurrence sought to be admitted. But this satisfies only half the test. In addition, each participant in the chain producing the record, from the initial declarant to the final entrant, must be acting within the course of regular business conduct or the declaration must meet the test of some other hearsay exception *(Johnson v Lutz,* 253 NY 124, 128; *Toll v State of New York,* 32 AD2d 47, 50). Thus, not only must the entrant be under a business duty to record the event, but the informant must be under a contemporaneous business duty to report the occurrence to the entrant as well (Richardson, Evidence [10th ed — Prince], § 299) * * *

"Unless some other hearsay exception is available *(Toll v State of New York, supra),* admission may only be granted where it is demonstrated that the informant has personal knowledge of the act, event or condition and he is under a business duty to report it to the entrant *(Johnson v Lutz, supra;* cf. Model Code of Evidence, rule 514)." *(Matter of Leon RR,* 48 NY2d 117, 122-123; see, also, *Secor v Kohl,* 67 AD2d 358, 363).

In the case at bar, Police Officer Charles Colan, who had prepared the accident report received into evidence, had not witnessed the accident. He testified, however, to having interviewed several witnesses. Nevertheless, he could not remember the names or identities of those witnesses, except for the engineer and motorman of the train involved in the accident. Moreover, the officer was initially certain that he had not interviewed the plaintiffs or defendant John Donlan, Jr. Later, he testified to having had a conversation with said defendant.

The sources of information for the police accident report were therefore unclear. Even more unclear was the source of that information contained in the report that concluded the cause of the accident to have been the excessive speed of the Donlan car. There was no testimony as to who made that statement, whether he was under a business duty to make it, or whether some other hearsay exception would render the statement admissible, e.g., a party admission.

The police accident report, therefore, contained hearsay statements relevant to ultimate issues of fact in the instant

case. This was particularly true in reference to the critical issue of the speed of the Donlan car, upon which there had been conflicting testimony.[3] Accordingly, the report's admission into evidence constituted prejudicial and reversible error.

## B

There remains the question of the conclusory nature of the police report's entry concerning the cause of the subject accident.

The opinion in the report as to the speed of the Donlan car and its failure to yield the right of way is not credited to anyone. If it was that of someone interviewed at the accident scene by the police officer, it was clearly excludable under the foregoing hearsay analysis. It would have been a recorded statement made by someone whose duty to make such a statement was unproven.

If, however, the opinion was that of the police officer, and it was a qualified opinion, the hearsay exception in CPLR 4518 would apply (see *People v Kohlmeyer*, 284 NY 366). The crucial question, therefore, is whether the police officer's opinion was qualified. Since the officer had not witnessed the accident his opinion as to its cause had to be based on postincident expert analysis of observable physical evidence. There was no proof of analysis of that type, nor of the officer's qualifications to conduct one. Moreover, there was no proof that he was qualified to render an opinion based on such an analysis (cf. *Lopez v Yannotti*, 24 AD2d 758, app dsmd 17 NY2d 787). Thus, to the extent that the accident report contained unqualified opinion evidence by Police Officer Colan, the report was inadmissible (see *Clarke v Nadel*, 50 AD2d 851, 852; *Westmoreland v Wilgo Realty Corp.*, 45 AD2d 887, 889; *Albert v Stumpf*, 30 AD2d 686, 687).

## II

The second issue on appeal is whether the trial court

---

3. Paul Mott, Jr. testified that the speed of the Donlan car had been 50 to 55 miles per hour. Donald F. Coons testified that the speed of the car had been 35 to 40 miles per hour. John Donlan, Jr. stated that he had been driving at 30 miles per hour until he reached the railroad crossing, when he reduced his speed to between 25 and 30 miles per hour.

erred in taking judicial notice of the stopping distance of an automobile traveling at a certain rate of speed.

This court's attention has been drawn to only one case in this jurisdiction that directly addresses the instant issue.[4]

Plaintiffs cite *Hoffman v Lehman* (204 Misc 1053, mod 286 App Div 487, affd 2 NY2d 824). They urge that *Hoffman* not only authorizes judicial notice of automobile stopping distances in general, but also the very stopping distance charged to the jury in the case at bar. For there, as here, the trial court took judicial notice of the fact that " 'an automobile equipped with good brakes, travelling ten to twelve miles per hour, can be stopped in considerably less than fifteen feet' " (204 Misc 1053, 1055).

In *Hoffman*, the trial court, without a jury, found defendant bus company liable for personal injuries sustained by a passenger on one of its buses. The bus in question had been traveling at a speed of 10 to 12 miles per hour. A taxicab to its right, had been proceeding in the same direction, when it overtook the bus and cut in front of it by approximately 15 feet. The bus driver immediately applied his brakes and stopped his bus about two feet from the cab. Due to the abrupt stop, the plaintiff passenger was thrown from her seat and injured. She sued the bus company on the theory that its driver had been negligent in applying his brakes so suddenly.

In finding for the plaintiff against the bus company the trial court concluded that the company's driver had been negligent in unnecessarily slamming on his brakes. By judicial notice, it was established at trial that by applying normal brake pressure the stopping distance of the subject vehicle would have been considerably less than 15 feet. Thus, to have applied sudden and forceful pressure to the brakes was unwarranted, given the distance between the bus and taxicab.

The Appellate Division, First Department, disagreed and

---

4. Throughout the following discussion, the court understands judicial notice to be that "mode of ascertainment by judicial authority of matters of universal knowledge without having such matters established by evidence in the individual case" (21 NY Jur, Evidence, § 8, p 165, and the cases cited therein).

modified the judgment to the extent of dismissing the complaint as against the bus company and otherwise affirmed as against the taxi owners. It held: "The very fact that only two feet separated both vehicles from actual collision is convincing proof that there was no margin for nice admeasurement of the force to be applied to the brakes * * * Here the driver sprang to action decisively and skilfully. The physical facts establish conclusively that had he attempted to check or graduate the abruptness of the stop, or had he wavered in making his decision, the bus would have collided with the taxicab * * * In immediately applying his brakes as forcefully as he could the driver made the only proper and prudent decision open to him". *(Hoffman v Lehman, 286 App Div 487, 488, supra.)*

Admittedly, in its decision in *Hoffman*, which was affirmed, without opinion, by the Court of Appeals, the Appellate Division never reached the issue of taking judicial notice of automobile stopping distances. Nevertheless, it cast doubt on the very stopping distance established by the trial court in that case. The Appellate Division found that the taxicab had been 15 feet in front of the bus. At that point, the driver had "decisively", "skillfully", and "immediately" applied his brakes with as much pressure as possible *(Hoffman v Lehman, 286 App Div, at p 488)*. And yet the Appellate Division found that the bus had stopped only two feet from the cab. Thus, by applying emergency-force pressure to the brakes the driver was only able to stop his bus in 13 feet—a far cry from the "considerably less than fifteen feet" which was projected by the trial court as the stopping distance under normal brake pressure (204 Misc, at p 1055). In fact, the appellate court observed that if the driver had checked or graduated the abruptness of the stop, the two vehicles would have collided. In other words, by applying less than emergency-force brake pressure, the bus would not have stopped in less than 15 feet.

Thus, the stopping distance established at trial by judicial notice was not accepted, as a matter of law by the appellate court. It was, instead, deemed questionable. Consequently, whether stopping distances in general are properly matters for judicial notice is far from answered by *Hoffman v Lehman (supra)*.

Appellants cite *Keppler v New York Cent. R.R. Co.* (263 App Div 199) for the proposition that vehicular stopping distances are not properly matters for judicial notice. Evidence of this nature can only be supplied by experts or lay witnesses with relevant experience. The *Keppler* case, however, is not exactly on point since it deals with trains and not automobiles. It is analogous to the situation at bar, but it could be distinguished as relating to specialized vehicles not commonly operated by, and known to, the general public.

A case on point is *Rosenberg v American Ry. Express Co.* (198 NYS 224). There the defendant's driver testified that he had been driving his truck south on Third Avenue in Manhattan at two miles per hour. Approaching 42nd Street, he had applied his brakes and skidded five or six feet, colliding with plaintiff's car. A traffic officer testified (p 225) that the streets had been wet due to "flush[ing] by the street cleaning department."

The Appellate Term, First Department, reversed the Municipal Court judgment in favor of defendant and entered judgment for plaintiff, stating (p 225) : "A loaded truck moving 2 miles an hour on a granite block pavement does not skid 5 feet when the brakes are applied in the deliberate manner available under the circumstances disclosed * * * These are matters of common knowledge and everyday mechanics of which any court may take judicial notice."

Cognizant that *Rosenberg (supra)* has no precedential value for this court, we also believe it has little persuasive value. It is a 1923 case involving a truck of unspecified size and weight, loaded with an unknown quantity of described goods. This court cannot accept, as a matter of law, that the amorphous truck in *Rosenberg* was incapable of skidding five feet on wet streets. Moreover, it would be confusing and misleading, if the "fact" of that truck's stopping distance and the process of judicial notice by which it was established, were recognized as currently applying to any truck or motor vehicle traveling on wet streets at two miles per hour.

Thus, we have been unable to discover any controlling, or

even persuasive, case within our jurisdiction on the issue of taking judicial notice of automobile stopping distances.

An examination of decisions in other States reveals a split in the authorities (see Ann. 84 ALR2d 979, §§ 4, 5; 83-87 ALR2d Later Case Serv, p 178), among which is a decision by the Supreme Court of the State of Connecticut *(Thomas v Commerford*, 168 Conn 64, 69), expressing the following opinion: "The better practice is to have opinion testimony of an expert as to the speed of a motor vehicle based on skid marks and other physical facts proven on the trial of each particular case. See note, 29 A.L.R.3d 248, 252 § 2[b]; see also *Waldron* v. *Raccio*, 166 Conn. 608, 612, 353 A.2d 770; *Toomey* v. *Danaher*, 161 Conn. 204, 210, 286 A.2d 293. When a witness testifies, his testimony can be challenged and the trier can pass on his credibility and determine what weight should be given to the evidence. This is not true when a fact is established by judicial notice."

It should be noted that in *Thomas (supra)* the trial court was found to have erred in taking judicial notice of a chart, issued by the State of Connecticut, and showing "average" stopping distances for an automobile under "favorable" conditions. The Connecticut court observed: "There are many factors which affect the stopping distance of a motor vehicle including the reaction time among individual drivers, the weight of the vehicle, the type and condition of brakes, the force with which the brakes are applied, and the type and condition of the roadway surface. See *McDonald* v. *Mulvihill*, 84 N.J. Super. 382, 388, 202 A.2d 213. Those factors are all interrelated, and each is a variable in any given situation. Charts showing stopping distances are based on certain assumptions as to those variable factors, which cannot be said to be generally known in the 'ordinary experience of life or . . . capable of ready and unquestionable demonstration.' *State* v. *Tomanelli*, supra, 369." *(Thomas v Commerford, supra,* p 69.)

■ In the case at bar, a uniform chart, a State or nationally recognized table, or a commonly used formula was not even involved. In fact, on this record, there appears to be no basis for the stopping distance recognized by the trial court. Moreover, it was not clearly indicated to the jury

that it was an average distance for automobiles operating under favorable conditions. Thus, the judicial notice taken in the instant case was even more infirm than that taken in *Thomas v Commerford (supra)* and constituted error.

We have examined appellants' other contentions, as are preserved, and find them to be academic or without merit.

Accordingly, for all the foregoing reasons, the judgment must be reversed and a new trial granted.

TITONE, J.P., RABIN and GULOTTA, JJ., concur.

Interlocutory judgment of the Supreme Court, Suffolk County, entered January 11, 1980, reversed, on the law, and new trial granted as to all parties and causes, with costs to abide the event.