Gary PERFETTO, Petitioner,

v.

Robert HOKE, Respondent.

Nos. 94–CV–4177 (JS), 88–CV–3822 (JS).

United States District Court,
E.D. New York.

Aug. 23, 1995.

Anthony V. Lombardo, New York City, for petitioner.

Gary Fidel, Queens County District Attorney's Office, Kew Gardens, NY, for respondent.

## MEMORANDUM AND ORDER

SEYBERT, District Judge.

Petitioner Gary Perfetto seeks a writ of habeas corpus from this Court pursuant to 28 U.S.C. § 2254. Petitioner was convicted in 1984 of murder in the second degree and robbery in the first degree. He is presently serving a concurrent sentence of 20 years to life for murder and 8–⅓ to 25 years for robbery.

In his application for collateral relief, petitioner asserts three claims. In his first claim, he contends that his Sixth Amendment rights to confrontation and cross-examination were violated by the admission into evidence of a memorandum prepared shortly after the murder by a deceased night watchman. In his second and third claims, petitioner alleges that he was denied his Sixth Amendment right to present a defense due to the exclusion from evidence of police reports documenting interviews with the night watchman and a prosecution witness.

Having reviewed the submissions of both parties and the complete record of the state court proceedings, the Court hereby denies the petition in its entirety, for the reasons discussed below.

## BACKGROUND

At petitioner's trial, held in February and March 1985, the prosecution introduced evidence to show the following: In the early morning of Saturday, July 19, 1980, Sheldon Horowitz, an independent retail distributor for Tropicana Products, Inc., was bludgeoned to death on the premises of the Tropicana Plant in Whitestone, Queens. Patrick McKenna, the night watchman at the plant, discovered his body later that evening at approximately 12:45 a.m. (Tr. at 85–88.)[1] Petitioner Gary Perfetto, a "loader" at the plant, was the subject of the initial investigation because (1) McKenna had seen him on the plant premises immediately prior to the murder when he was not authorized to be there (Tr. at 223); (2) when McKenna asked Perfetto what he was doing there, he responded by saying he had been helping Dave Weber, another distributor, but Weber had not requested assistance that evening (Tr. at 223); and (3) though Perfetto was scheduled to work the next Sunday evening, he failed to appear for work (Tr. at 611).

As an independent Tropicana distributor, Horowitz would bring his truck to the Whitestone plant nightly where employees, known as "loaders," would load the truck. He would return the next morning, take the loaded truck and distribute the Tropicana products on his route. After completing the route, Horowitz would drive the truck back to the plant for reloading, carrying the cash and checks collected on his route in a brown paper bag. (Tr. at 181–86, 193.)

Joyce Horowitz Camm, Sheldon Horowitz's wife, who kept the books for their business, testified that her husband would have had approximately $2,900 upon completion of his route on July 19, 1980. (Tr. at 703.) He was found with only $395 in cash, $900 in checks, and $380 in credit card charge slips on his person. (Tr. at 704.) Using the figures provided by Camm, monies in the amount of approximately $1,600 were missing from Horowitz's possession.

The prosecution also introduced evidence showing that Perfetto had confided to friends, shortly after the incident, that he had become involved in an altercation at work, that he had killed a man and that he needed money. Christine Reilly, to whose home petitioner arrived in the morning following the murder, testified that upon his arrival, petitioner appeared pale and upset and that he said, "that he had hurt somebody ... and it was to do with the piping, it was to do with the money." (Tr. at 384–85.) She later indicated that Perfetto had told her that the amount of money involved was $1500. (Tr. at 389.) She also testified that petitioner mentioned a discussion he had with his father in which the father had told petitioner to turn himself in to the police. (Tr. at 387.)

On Sunday morning, July 20th, Christine Reilly and petitioner arrived at Laura Vitacco's home on Long Island. Perfetto had

---

1. "Tr" and "H" numerical references are to pages of the trial transcript and pretrial hearing, respectively.

"heard that [Vitacco] was religious and wanted [her] to pray for him, that he was hurting" (Tr. at 897.) Petitioner stayed at Vitacco's home overnight, and Monday "again [ ] asked [Vitacco] to pray for him" (Tr. at 898.) On Tuesday, July 22, Vitacco testified that she and Perfetto prayed together and read from the Bible. After the reading, Perfetto said, "I killed a man." When Vitacco answered, "Accidents happen." petitioner allegedly responded saying, "[n]o, I killed a man with a lead pipe." (Tr. at 899–900.)

Vitacco's husband testified that he drove Perfetto to New York City from Long Island and that during the drive, Perfetto stated that "he had gotten into some trouble. He was going home to turn himself into the police. He had called his father and his father said to come home. And the following day he's going to turn himself in ... I had a fight on my job. I hurt someone, and I can face what I have to face." (Tr. at 1053.)

In addition to the alleged admissions made by Perfetto, the prosecution also sought to introduce at trial a memorandum prepared by Patrick McKenna (hereinafter "McKenna Memorandum"). At a pre-trial suppression hearing, the prosecution indicated that three days after the killing, McKenna had prepared the handwritten memorandum for his supervisor at Tropicana concerning the circumstances surrounding Horowitz's murder. This memorandum recounted seeing "Gary in his car [at the plant]. I asked him, what he was doing here at this time of night. He said he had went [sic] around with one route man. I asked him if he had seen Horowitz. He said no, he was with Dave Weber." (Tr. at 223.) The prosecution also revealed that McKenna would be unable to testify since he had died before trial of unrelated causes. Petitioner's counsel moved to suppress the memorandum as hearsay.

To show that the McKenna Memorandum constituted a business record under N.Y.Civ. Prac.L. § 4518(a), and therefore was admissible as an exception to the rule against hearsay evidence, Rudy Wishner, a vice president at the Whitestone plant, testified regarding the routine nature of the McKenna Memorandum. He stated that the night watchmen were required to keep a log of vehicles and people entering and leaving the plant and to file reports whenever anything "unusual" occurred which could require the plant manager's attention. (H. at 7; Tr. at 295.) During the months of June and July 1980, three such reports were filed, one concerning a fire, the second concerning a loss of telephone service, and the third concerning Horowitz's murder. (H. at 68.) On the basis of the third report prepared by McKenna, Tropicana implemented numerous security improvements. (Tr. at 219–21.) Based on Wishner's testimony, the trial court ruled that the report had been made in the ordinary course of business, that McKenna was required to prepare it under company policy, that it was contemporaneously written, and that therefore, the McKenna Memorandum did fall within the business records exception to the hearsay rule and was admissible. (H. at 128–134.)

Petitioner was convicted at trial of felony murder in the second degree and robbery in the first degree. This conviction was affirmed on appeal to the Appellate Division, which found, *inter alia*, that the trial court was correct in admitting the McKenna Memorandum under the business records exception to the hearsay rule. *See People v. Perfetto*, 133 A.D.2d 127, 128–29, 518 N.Y.S.2d 662 (1987). The Appellate Division did not consider the claims that petitioner has now raised with respect to the two police reports that were excluded from evidence, one of which detailed a conversation with McKenna and another a conversation with Laura Vitacco, a prosecution witness.

The procedural history of this case having been set forth above, the Court now turns to address whether it may reach the merits of petitioner's claims.

## DISCUSSION

### I. *Exhaustion*

 Under 28 U.S.C. § 2254, a federal court may not review the substantive merits of an applicant's claim for collateral relief unless "the applicant has exhausted the remedies available in the courts of the state." 28 U.S.C. § 2254(b) (1988); *see Rose v. Lundy*, 455 U.S. 509, 510, 102 S.Ct. 1198, 1199, 71 L.Ed.2d 379 (1982); *Picard v. Connor*, 404 U.S. 270, 275–76, 92 S.Ct. 509, 512–13, 30

L.Ed.2d 438 (1971). This requirement is not a jurisdictional limitation, but is predicated on principles of judicial comity, and is "designed to protect the state courts' role in the enforcement of federal law and [to] prevent [the] disruption of state judicial proceedings." *Rose,* 455 U.S. at 518, 102 S.Ct. at 1203.

The Second Circuit Court of Appeals has set forth a two-prong test for determining whether a petitioner seeking federal habeas relief has exhausted his or her state remedies. First, an applicant must have "fairly presented" his federal claim to the state courts. *See Daye v. Attorney Gen.,* 696 F.2d 186, 191 (2d Cir.1982) (en banc). To satisfy this requirement, the petitioner must demonstrate that he has informed the state courts of both the factual and the legal premises of the claim that he now asserts in federal court. *See id.* (citing *Picard,* 404 U.S. at 276–77, 92 S.Ct. at 513).

The second prong of this doctrine generally requires the applicant to utilize all available avenues of appellate review within the state court system before proceeding to federal court. *See Daye,* 696 F.2d at 190. Typically, this criterion requires a direct appeal to the highest court of the state. *See id.* n. 3. This requirement, however, may also be satisfied where the applicant has collaterally attacked the judgment of conviction within the state courts, and thereafter has appealed the denial of his application to the highest court of the state. *See Lloyd v. Walker,* 771 F.Supp. 570, 574 (E.D.N.Y.1991) (Exhaustion requirement met where state collateral review had been obtained through filing of a motion to vacate judgment, pursuant to N.Y.Crim.Proc.L. § 440.10, followed by eventual appeal to New York Court of Appeals).

In the instant action, petitioner raised his first claim, based on a Sixth Amendment right to confrontation, on direct appeal. Petitioner also raised in his appellate brief his second claim based on a Sixth Amendment right to present a defense, asserting that the police interview of Patrick McKenna should not have been excluded from evidence. Accordingly, these claims are exhausted and

may be heard by the Court. The third claim based on exclusion from evidence of the police interview with prosecution witness Laura Vitacco was not, however, put forth either on appeal or in any subsequent collateral proceeding and therefore is not exhausted.

## II. *Issue Preclusion*

A petition containing both exhausted and unexhausted claims (a so-called mixed petition) must ordinarily be dismissed in its entirety. *See Rose,* 455 U.S. at 510, 102 S.Ct. at 1199; *Levine v. Comm'r of Correctional Servs.,* 44 F.3d 121, 124 (2d Cir.1995). Where a petitioner would be precluded from presenting the unexhausted claim to the State courts, however, the federal courts may proceed to address the merits of the exhausted claims. *See Duckworth v. Serrano,* 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981) (Exhaustion required unless there is no possibility of obtaining relief in state court); *Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991); *see also Holmes v. Bartlett,* 810 F.Supp. 550, 554 (S.D.N.Y.1993). "For exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.'" *Grey,* 933 F.2d at 120 (quoting *Harris v. Reed,* 489 U.S. 255, 263 n. 9, 109 S.Ct. 1038, 1043 n. 9, 103 L.Ed.2d 308 (1989)).

Under New York law, petitioner would be prohibited from seeking more than one appeal in the New York Court of Appeals. *See* McKinney's 1994 Revised N.Y.Court Rules § 500.10(a); *Washington v. James,* 996 F.2d 1442, 1447 (2d Cir.1993) *cert. denied,* —— U.S. ——, 114 S.Ct. 895, 127 L.Ed.2d 87 (1994), *Grey* 933 F.2d at 120; *Gatto v. Hoke,* 809 F.Supp. 1030, 1035 (E.D.N.Y.1992). Collateral review is also unavailable where a petitioner could have, but failed to raise his claim on direct review. *See* N.Y.Crim.Proc.L. § 440.10(2)(c) (McKinney 1978); *Washington,* 996 F.2d at 1447. Since petitioner's claim regarding exclusion of the police interview of Laura Vitacco was not put forth on petitioner's direct appeal, the state courts would refuse to hear the claim at this point in time, either in another direct appeal

or on collateral review. Accordingly, requiring, before considering any of petitioner's exhausted claims, that petitioner return to state court on his unexhausted claim would be fruitless. The Court may therefore proceed to the merits of the exhausted claims.

 The Court may also hear petitioner's unexhausted claim, provided that he can show (1) cause for the failure to develop the claim in state court and actual prejudice resulting therefrom or (2) that a fundamental miscarriage of justice would result. *See Coleman v. Thompson*, 501 U.S. 722, 749, 111 S.Ct. 2546, 2564, 115 L.Ed.2d 640 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 485, 106 S.Ct. 2639, 2643, 91 L.Ed.2d 397 (1986)); *Wainwright v. Sykes*, 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977); *Washington*, 996 F.2d at 1447. Petitioner has made no showing of cause and actual prejudice with respect to his unexhausted claim. A fundamental miscarriage of justice only occurs "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Washington*, 996 F.2d at 1447 (quoting *Murray v. Carrier*, 477 U.S. at 496, 106 S.Ct. at 2649). The ample evidence against petitioner in the instant case indicates that a fundamental miscarriage of justice has not occurred. Therefore, petitioner's unexhausted third claim based on exclusion from evidence of the police interview with Laura Vitacco, does not pass the procedural threshold analysis. The Court will therefore only address the merits of petitioner's first two exhausted claims.

### III. *Analysis of the Merits of Petitioner's Claims*

#### A. *Sixth Amendment Right to Confrontation*

 Petitioner contends that he was denied his Sixth Amendment right to confrontation and cross-examination due to the admission into evidence of the McKenna Memorandum. Petitioner asserts that this deprivation arose from his inability to cross-examine McKenna regarding the reliability of the memorandum's contents and from the fact that the memorandum did not meet the requirements of a business record under Civ. Prac.L. & R. § 4518(a) and therefore constituted inadmissible hearsay.[2]

 Petitioner's assertion that McKenna's death and resulting lack of availability at trial deprived him of his constitutional right to confrontation is without merit. The right of "cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas*, 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965); *see also Kirby v. United States*, 174 U.S. 47, 55, 19 S.Ct. 574, 577, 43 L.Ed. 890 (1899). However, this "right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal process." *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1965). While the Confrontation Clause reflects a preference for face-to-face confrontation at trial "in order that [the jury] . . . may look at [the witness], and judge . . . whether he is worthy of belief" *Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895), " 'we have attempted to harmonize the goal of the Clause—placing limits on the kind of evidence that may be received against a defendant—with a societal interest in accurate factfinding, which may require consideration of out-of-court statements.' " *Maryland v. Craig*, 497 U.S. 836, 849, 110 S.Ct. 3157, 3165, 111 L.Ed.2d 666 (1990) (quoting *Bourjaily v. United States*, 483 U.S. 171, 182, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987)).

---

2. N.Y.Civ.Prac.L. and R. § 4518(a) provides that Any writing or record . . . made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible in evidence in proof of that act, transaction, occurrence or event, if the judge finds that it was made in the regular course of any business and that it was the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter. All other circumstances of the making of the memorandum or record, including lack of personal knowledge by the maker, may be proved to affect its weight, but they shall not affect its admissibility.

The Supreme Court, in *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, set forth the test for determining when an out-of-court statement may be admitted against a defendant in a criminal case:

> [W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.

*Id.* at 66, 100 S.Ct. at 2539. In the instant case, the declarant is clearly "unavailable," as he had died by the date of trial.

 The remaining question is whether the McKenna Memorandum constituted a business record, thus falling under the business records exception to the rule against admission of hearsay. The business records rule is regarded as a firmly rooted hearsay exception. *Roberts*, 448 U.S. at 65 n. 8, 100 S.Ct. at 2539 n. 8; *United States v. Ray*, 930 F.2d 1368, 1371 (9th Cir.1990); *United States v. Norton*, 867 F.2d 1354, 1363 (11th Cir. 1989); *United States v. Baker*, 855 F.2d 1353, 1360 (8th Cir.1988). Accordingly, additional inquiry into the reliability of the McKenna Memorandum would be unnecessary if it were determined to be a business record.[3]

Both the trial court and the Appellate Division found that the McKenna Memorandum fell within New York's business records exception to the rule against hearsay evidence. The state trial court held an *in limine* hearing on the admissibility of the McKenna Memorandum and found that McKenna was required to report to his superiors any unusual events occurring while he served as night watchman and that the McKenna Memorandum was prepared by McKenna shortly after the incident in the regular course of his work and not in anticipation of litigation. The Court therefore found that the memorandum met the requirements of New York's business record rule and was therefore admissible into evidence. (H. at 130–132.) The Appellate Division also directly addressed this issue, holding that "[McKenna] was required, as part of his duties ... to submit to his superiors reports ... such as the memorandum in question, and that he did so in the regular course of business.... Thus, we conclude that the subject memorandum was properly admitted under the business records exception to the hearsay rule." *People v. Perfetto*, 133 A.D.2d 127, 518 N.Y.S.2d 662, 664 (1987).

Under 28 U.S.C. § 2254(d), a federal court reviewing a habeas petition generally must presume correct a state court's findings of fact that have been ascertained "after a hearing on the merits ... unless the conditions for one of the seven listed exceptions are met[4] or unless the state court findings are not 'fairly supported' by the record as a whole." *Ventura v. Meachum*, 957 F.2d 1048, 1054 (2d Cir.1992) (citing *Sumner v. Mata*, 449 U.S. 539, 550, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981) and quoting 28 U.S.C. § 2254(d)); *see also Knapp v. Leonardo*, 46 F.3d 170, 175 (citations omitted). In the instant action, petitioner, who is represented by counsel, has not alleged, nor does the

---

**3.** Petitioner, who is represented by counsel, has not alleged that New York's business record rule is more expansive than that of other jurisdictions and thus not a firmly rooted exception. Indeed, the comparable federal rule of evidence, Fed. R.Evid. 803(6) would require the same showing as is in contention in this case, *i.e.*, that the McKenna Memorandum was prepared in the regular course of business and that Tropicana's ordinary practice was to prepare such a document.

**4.** The seven exceptions in 28 U.S.C. § 2254(d) are as follows:

"(1) that the merits of the factual dispute were not resolved ...
(2) that the factfinding procedure ... was not adequate to afford a full and fair hearing ...
(3) that the material facts were not adequately developed ...
(4) that the State court lacked jurisdiction of the subject matter or over the person ...
(5) that the applicant was an indigent and the State court ... failed to appoint [him] counsel ...
(6) that the applicant did not receive a full, fair, and adequate hearing ...
(7) that the applicant was otherwise denied due process of law ...''

Court find, that any of the seven exceptions are applicable.

Nor does the Court find that the state court's determination lacked fair support in the record. The initial requirements of timeliness and authenticity are satisfied in that the memorandum was prepared only a few days after the murder and was in McKenna's handwriting. Wishner, who was in charge of the plant's security at the time of the murder, testified at the hearing that the plant's night watchmen were required to fill out reports of unusual incidents. He also testified that three such reports, including the McKenna Memorandum, had been made during the period from June through July 1980.[5] Wishner further noted that no one, to his knowledge, had instructed McKenna to prepare the memorandum, allowing an inference that McKenna believed it was his ordinary work responsibility to write such a document and that litigation was not the reason for its creation. In fact, Wishner revealed that Tropicana's insurance company did not discuss the incident with anyone at the plant until "many months afterwards." (H. at 63.) Wishner also emphasized that Tropicana used the information contained in the McKenna Memorandum to implement new security measures at the plant.

■ The state court explicitly found Wishner's testimony to be "credible and not marred by any serious inconsistencies." (H. at 128–29.) As "28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine the credibility of witnesses whose demeanor has been observed by the state trial court, but not by them," *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983), the Court is not at liberty freely to question this credibility assessment. Based on the testimony concerning Tropicana's security practices, the state court's decision regarding whether the McKenna memorandum met the requirements of a business record is entitled to a presumption of correctness.

■ "Where the presumption applies, the burden 'shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.'" *Ventura*, 957 F.2d at 1054; *see also Knapp v. Leonardo*, 46 F.3d at 175 (citations omitted). Petitioner argues that because, by Wishner's own testimony, the McKenna Memorandum was an unusual report, it could not be considered to be prepared in the regular course of business. Petitioner also asserts that since the McKenna Memorandum was written three days after the murder, it must have been prepared in anticipation of litigation. These arguments are belied by Wishner's testimony, outlined supra. In light of this testimony, petitioner cannot establish by convincing evidence that the state trial court made an erroneous factual determination in concluding that the McKenna Memorandum constituted a business record.

Accordingly, because the McKenna Memorandum fell within a firmly rooted exception to the rule against admission of hearsay evidence and McKenna was clearly unavailable to testify, its admission into evidence was proper and thus not in violation of petitioner's constitutional rights.

## B. *Sixth Amendment Right to Present a Defense*

■ Petitioner's second claim is that he was deprived of his Sixth Amendment right to present a defense due to the exclusion of a police report interviewing Patrick McKenna, which allegedly contained exculpatory evidence. It is unclear from the record whether petitioner sought to introduce into evidence the police report prepared by Detective Evola (Tr. at 137) or the police report prepared by Detective Perfano, another detective who investigated the murder. (Tr. at 1109). The pages to which petitioner refers in the transcript arguably seem to address only the Perfano's report, although the trial judge's ruling was somewhat ambiguous and could be viewed as extending to cover Evola's report as well. Because it is unclear whether

---

5. Wishner noted that one of these reports related to a fire and was needed for insurance purposes. (Tr. at 217.) This testimony does not, however, necessitate finding that all "unusual" reports were prepared for insurance purposes. Another "unusual" report in the same time period concerned the need for telephone repairs, something which was unlikely to be related to insurance.

petitioner's counsel is referring to the trial court's ruling on the admissibility of Detective Evola's or Detective Perfano's report, the Court will examine both reports and their implications for this claim.

Evola's report, prepared on the day of the murder, consisted of an interview with the night watchman, Patrick McKenna. Petitioner claims that this report contained "exculpatory evidence" needed to prove his innocence. This is based on the fact that Evola testified that he failed to include in the report "the name or any of the particulars concerning the person who was wanted for this specific incident." (Tr. 144–45.) Petitioner's argument is that McKenna must therefore have not mentioned to Evola that he suspected Perfetto, rendering questionable his mention three days later in the McKenna Memorandum of seeing petitioner at the plant on the night of the murder. Petitioner also argues that Perfano's report, which consisted of a follow-up interview of McKenna on the day of the murder, was exculpatory since it also failed to specify Perfetto as a possible suspect.

▮▮▮ While the right to present a defense has been recognized as "one of the 'minimum essentials of a fair trial,'" *Rosario v. Kuhlman,* 839 F.2d 918, 924 (2d Cir.1988) (quoting *Chambers,* 410 U.S. at 294, 93 S.Ct. at 1045), this right is not unlimited. Thus, the right to present a defense "does not give criminal defendants carte blanche to circumvent the rules of evidence. Restrictions on a defendant's presentation of evidence are constitutional if they serve 'legitimate interests in the criminal trial process' . . . and are not 'arbitrary or disproportionate' to the purposes they are designed to serve." *United States v. Almonte,* 956 F.2d 27, 30 (2d Cir. 1992) (quoting *Rock v. Arkansas,* 483 U.S. 44, 55, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987)); *see also Michigan v. Lucas,* 500 U.S. 145, 150, 111 S.Ct. 1743, 1747–48, 114 L.Ed.2d 205 (1991); *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) (citing *Chambers,* 410 U.S. at 302, 93 S.Ct. at 1049); *Williams v. Lord,* 996 F.2d 1481, 1483 (2d Cir.1993).

▮▮▮ In this case, the trial judge determined that the reports did not fall under an accepted hearsay exception. Though N.Y.Civ.Prac.L. & R. § 4518(a) (McKinney 1978) generally allows for the admission of police reports into evidence as business records, they must be excluded if the recording officer did not observe the matter personally *and* the declarant did not have a duty to make the statement to the recording officer. *See Johnson v. Lutz,* 253 N.Y. 124, 127–28, 170 N.E. 517 (1930); *People v. Dyer,* 128 A.D.2d 719, 513 N.Y.S.2d 211, 212 (1987); *People v. Wilson,* 123 A.D.2d 457, 506 N.Y.S.2d 760, 761 (1986); *Murray v. Donlan,* 77 A.D.2d 337, 433 N.Y.S.2d 184, 190 (1980); *Hayes v. State,* 50 A.D.2d 693, 376 N.Y.S.2d 647, 648 (3d Dep't.1975); *see also* Weinstein et al., 5 New York Civil Practice § 4518.02 (Bender 1994).

> [U]nder *Johnson's* definition of 'a writing . . . made in the regular course of business,' memoranda would not be included if based upon information derived from third parties whose communications were casually and voluntarily made and not pursuant to a business duty or obligation. Consequently, a recorder may be under a business duty to record information supplied to him, while his informant is not duty bound to supply that information. If so, a writing created as a result of such a transaction would not be admissible in evidence as a hearsay exception under the statutory business record rule.

*Murray,* 433 N.Y.S.2d at 188. The state trial court determined that Evola and Perfano did not personally observe the events on the night in question and that McKenna was under no business duty to speak to the police. (Tr. at 1114.) Therefore, the trial court reasoned, neither Evola's or Perfano's report was an admissible business record. Assuming that the trial court's factual analysis was correct, its ruling would be consistent with commonly recognized principles barring the introduction of hearsay testimony of the type in question. *See generally* Fed.R.Evid. 801(6)–(8). The exclusion of the reports would seem, therefore, to be a legitimate and reasonable constraint on petitioner's ability to offer evidence at trial.

▮▮▮ Petitioner himself does not appear to question the propriety of the trial

court's ruling that these reports were not business records.[6] Rather, petitioner argues that, even if the reports did not fall under an accepted hearsay exception, the trial court should not have applied the rule against hearsay evidence in a "pedantic and wooden manner and exclude reliable and probative evidence." (Petition, 88–CV–3822, at 31.) Even assuming, *arguendo*, that petitioner is correct in asserting that the trial court should have admitted these reports under some general hearsay exception similar to Fed.R.Evid. 803(24), this Court is limited in its habeas review only to considering whether the challenged ruling involved error of constitutional magnitude. *See, e.g., Richmond v. Lewis*, 506 U.S. 40, ——, 113 S.Ct. 528, 536, 121 L.Ed.2d 411 (1992); *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991). That is, the error must have deprived petitioner of a fundamentally fair trial. *Rosario*, 839 F.2d at 924 (citing *Chambers*, 410 U.S. at 294, 93 S.Ct. at 1045; *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir.), *cert. denied*, 464 U.S. 1000, 104 S.Ct. 503, 78 L.Ed.2d 694 (1983)); *Roberts v. Scully*, 875 F.Supp. 182, 188–89 (S.D.N.Y. 1995).

■ "It is the materiality of the excluded evidence to the presentation of the defense that determines whether a defendant has been deprived of a fundamentally fair trial." *Rosario*, 839 F.2d at 925 (citing *Taylor*, 708 F.2d at 891). Materiality has been interpreted to mean that " '[i]f there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively mi-

nor importance might be sufficient to create a reasonable doubt.' " *Rosario*, 839 F.2d at 925 (quoting *United States v. Agurs*, 427 U.S. 97, 112–113, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976)).

The excluded evidence would not have raised reasonable doubt about guilt. First, Petitioner's counsel was able to cross-examine Evola in detail regarding his report:

> Q.: And could you tell us whether or not the complaint report contains a space concerning itself and dealing itself with persons who are wanted in connection with a particular incident?
>
> A.: Yes, sir ...
>
> Q.: After speaking to Mr. McKenna, the nightwatchman, did you fill in any information concerning persons wanted in regard to this incident?
>
> A.: No, sir.

(Tr. at 144–45.) The jury was thus aware of the fact that McKenna had not mentioned to the police that he suspected Perfetto.

Neither Evola's or Perfano's report was critical in rebutting the statements in the McKenna Memorandum about petitioner's presence at the plant on the night of the murder. McKenna's failure to mention Perfetto in speaking with Evola and Perfano arguably merely shows that McKenna did not suspect that Perfetto committed the crime. Whether McKenna considered Perfetto to be a suspect is a different issue from whether McKenna saw Perfetto at the plant on the night in question. Moreover, the plant's log and the standard weekend report that weekend watchmen were required to prepare, which showed no mention of Perfet-

---

6. Any challenge by petitioner of the trial court's ruling that the police reports were not business records would, in any event, almost certainly have failed. The trial court's factual conclusions would have been entitled to a presumption of correctness under 28 U.S.C. § 2254(d), for the first seven provisions of 28 U.S.C. § 2254(d) are inapplicable. Moreover, the trial court's ruling is fairly supported by the record. Despite detailed questioning on the scope of the night watchmen's duties, Wishner failed to mention that reporting to the police was one of these responsibilities. (Tr. at 207.) In fact, on cross-examination by petitioner's counsel, it was revealed that Wishner had stated under oath in a civil deposition, that night watchmen did not have a duty to report unusual incidents to the police. (Tr. at 296–97.) No other evidence in the record shows that McKenna was under a business duty to report to the police. As the trial court's ruling would have been entitled to a presumption of correctness and petitioner would not likely have been able to present convincing evidence that the trial court's determination was factually erroneous, *see Ventura*, 957 F.2d at 1054; *Knapp*, 46 F.3d at 175 (citations omitted), the Court would have accepted the trial court's finding that the reports were not business records.

to at the plant on the night in question, were admitted into evidence.

Moreover, there was substantial evidence, other than the McKenna Memorandum, linking Perfetto to the crime with respect to which admission of the police reports would not have assisted petitioner. Dave Weber, who, like Horowitz, owned a delivery route, testified at trial that he saw Perfetto's car in the parking lot of the plant on the night of the murder. Weber also indicated that he was familiar with Perfetto's car, having sat in it himself on numerous occasions. Weber further testified that he knew Perfetto was not required to work on the night of the murder and that he had not seen Perfetto on that night. (Tr. at 789.)

Two acquaintances of Perfetto, Christine Reilly and Laura Vitacco, testified that Perfetto had admitted to them that he had killed a man with a pipe. (Tr. at 384–85; 899–900.) Reilly further indicated that Perfetto had stated that he needed $1,500 (Tr. at 388), an amount approximating the monies missing from Horowitz's possession when he was killed. (Tr. at 704.) Laura Vitacco's husband testified that Perfetto had said that he had gotten into a fight and would turn himself into the police. These witnesses were thoroughly cross-examined. While cross-examination revealed that Reilly and Laura Vitacco were friends, that both had substance abuse problems and that Reilly had interacted with Perfetto socially, no clear motive for any of these witnesses to implicate Perfetto falsely was established. Moreover, Perfetto failed to report for work as scheduled after the murder. (Tr. at 611.)

Accordingly, based on the foregoing, the fact that McKenna had failed to mention Perfetto as a suspect in the two police reports created no reasonable doubt that did not otherwise exist. For the same reasons, any constitutional error in excluding the reports did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* — U.S. —, —, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993) (citing *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *Bibbins v. Dal-*

*sheim,* 21 F.3d 13, 16 (2d Cir.1994) (citing *Brecht,* — U.S. at —, 113 S.Ct. at 1716).

## IV. *Conclusion*

After careful review of the record and relevant law, the Court hereby denies petitioner's application for a writ of habeas corpus in its entirety and dismisses his petition. There being no question of substance for appellate review, the Court declines to issue a certificate of probable cause to appeal its decision.

**SO ORDERED.**