OPINION OF THE COURT
Kaye, J.
This appeal presents a novel application of the business records exception to the hearsay rule (CPLR 4518): two miniature pocket diaries, identified by the People’s retained expert as the master records of a loanshark kept in the regular course of his business, were received in evidence in a prosecution against defendant to establish that he was the loans-hark’s silent partner. We agree with the Appellate Division that a sufficient foundation for those records was not established, and there must be a new trial.
*572 In this prosecution for conspiracy and criminal usury, the People sought to prove that defendant, a Clarkstown police officer, was the silent partner of a usurer and fellow police officer named Thomas Manuli. It was the People’s theory that defendant had supplied the cash for Manuli to lend the victim (Frank DiMare) at a usurious rate of interest, in exchange for which defendant received a percentage of the usurious payments. The People’s evidence at trial essentially consisted of the testimony of DiMare, certain admissions of defendant and bank evidence, tape recordings of two telephone conversations, and the diaries and related expert testimony.
DiMare testified that he had initially borrowed $5,000 from Manuli in February 1981, and in May 1981 obtained an additional $10,000 loan at an interest rate of 3% ($450) per week. In late May or early June, DiMare (who testified his nickname was "Cigars”) repaid $5,000 and negotiated new terms for the balance — $475 per week for 32 weeks. By January 1982 — the end of the 32 weeks — he still owed Manuli about $2,300. In January 1982, he negotiated a $5,000 loan ($2,700 net of his preexisting debt) to be repaid in 20 $300 weekly installments, and gave as security the certificate of title and registration to his car. Over the next five months, DiMare made 10 or 11 payments. When Manuli demanded further payments, DiMare suggested that he buy cocaine from him. Manuli purchased one ounce of cocaine for $2,000 and received back $300 against the indebtedness.
DiMare testified that throughout his various transactions with Manuli, he believed that Manuli was working alone, although Manuli had at one point told him that "some friend of mine * * * is complaining.” DiMare did not know defendant.
Defendant admitted in a police interview that he had loaned $10,000 to Manuli, but said that the loan was to be repaid at the going rate of interest. Evidence from defendant’s bank indicated that on May 14, 1981, the date of the $10,000 loan to DiMare, he requested $10,000 in cash, that he received a teller’s check in that amount, and that the check was approved for cashing by another bank.
The People submitted two tape recordings of telephone conversations between defendant and Manuli. During the first, on July 6, 1982, defendant asked Manuli, "How did you make out with Frankie?” Manuli responded that he was going "to pick it up tonight” and "would work something out with him.” *573 Manuli told defendant that he had warned Frank that "this friend of mine, he, ah, you know, he’s, he’s not too happy.” The next day — July 7, 1982 — during a second conversation, Manuli told defendant that he "got the S — .” In that conversation defendant said he would visit Manuli that evening. Later that same day, Manuli’s apartment was searched pursuant to a warrant. In a metal box in the bedroom bureau the police found cash, the title and registration documents for a car belonging to DiMare’s wife, contraband and the two diaries.
The diaries, one for 1981 and one for 1982, contained scattered entries at various dates in each book, consisting of handwritten words, names and initials often followed by numbers or other names. Some of the entries were in ink, some in pencil, some had been changed. As a foundation for admission of the diaries into evidence, the People offered the testimony of a private investigator, retired police officer Michael Emanuelo, qualified as an expert in the field of criminal usury and records pertaining to criminal usury.[1]
Emanuelo testified that, in his experience, loansharks often have partners who underwrite their loans and usually receive 1% per week of the principal advanced to the usurers and loaned to the victims. Criminal usurers ordinarily keep master records of their transactions, including records of money paid to victims, amounts received from them, and payments to partners; they maintain such records themselves; and they keep their records in cryptic fashion, consisting of numbers preceded by names or symbols, indicating that they are scheduled to meet their victims or partners to make or receive payments. Entries are sometimes prerecorded in anticipation of payments, with numbers added upon actual receipt of the money.
The following key questions were asked and answered, after which the diaries were received in evidence over the objection of defense counsel that a sufficient foundation had not been established:
"Q Do you have an opinion as to what the nature of these books is?
*574 "A Yes, I do.
"Q What is that opinion?
"A These are master business records normally kept by usurers.
"Q Do you have an opinion as to whether these records were kept in the ordinary course of usury loan business?
"A Yes.
"Q What is that opinion?
"A They are loans given out to victims, payments received from victims and also payments of expenses to other individuals.
"Q Do you have an opinion by whom these entries were made?
"A I don’t understand your question.
"Q Do you have an opinion as to who it was, either by name or by category of who maintained these records?
"A Just by category. It was a usurer that kept these records.”
"the court: Would these be the type of records which would ordinarily be kept in the business of a usurer?
"the witness: Yes, it is, your Honor.”
After admitting the diaries, the court advised the jury that it was free to believe or disbelieve that these were regular records, despite the expert’s testimony.
With the diaries in evidence, Emanuelo’s remaining testimony was consumed by a detailed interpretation of the entries, identifying certain of the entries as names of victims and others as partners of the usurer. Emanuelo opined that in February and May 1981 certain entries reflected loans of $5,000 and $10,000 to Frank "Cigars”; that an entry in May 1981 — "Cigar 5,000” — indicated repayment; and that other entries, including one on May 29, 1981 — "Frank—600.00”— and one on June 5, 1981 — "Frank—750.00”—referred to payments against the indebtedness. Emanuelo further testified that in his opinion entries for "M.K.” and "Mike K” indicated one and the same person. The almost weekly notations, during the second half of 1981, reading "Mike K — 100” and "M.K.— 100” referred in Emanuelo’s view to payments by the usurer to "Mike K”, and were related to "Frank — $10,000”. (There were approximately 26 $100 entries referring to "Mike K” or "M.K.” in the 1981 diary, and none in the 1982 diary.) Because payments of $100 would be "approximately one per *575 cent” of $10,000, Emanuelo testified, "Mike K” was either the usurer’s partner or an independent usurer who advanced the principal to be furnished to the victim.
Thus, the testimony of Emanuelo that payments of $100 to "Mike K” or "M.K.” were actually payments to one person of 1% against a loan of $10,000, and that payments of 1% meant that Mike K. was the usurer’s silent partner, connected defendant as a participant in Manuli’s usurious loan to DiMare. The diaries and expert testimony also buttressed the testimony of DiMare, a convicted felon.
Defendant’s conviction of conspiracy in the fourth degree and criminal usury in the second degree was reversed by the Appellate Division, and a new trial ordered, on the ground that the People had failed to lay a sufficient foundation for the admission of the diaries. Critically lacking, in the view of the Appellate Division, was "testimony from someone with knowledge of the particular usurer’s record-keeping procedures that these diaries were made in the regular course of the usury business, that it was in the regular course of his business to make such records and that the notations were made at or soon after the purported transactions occurred.” (113 AD2d, at pp 844-845.)
This appeal presents several questions relating to CPLR 4518 (a),[2] technically made applicable to criminal prosecutions by CPL 60.10. In that the diaries were admitted as evidence of the truth of their terms and thus constitute hearsay, the requirements of CPLR 4518 (a) — pursuant to which they were offered[3] — must be satisfied, however reliable such records may otherwise be deemed to be (see, People v Nieves, 67 NY2d 125, *576 131). Moreover, while business records, once admitted, have no more probative force than any other evidence admitted pursuant to a hearsay exception, the threshold determination that they are business records satisfying the requirements of the statute is one of law. Whether records admitted pursuant to CPLR 4518 (a) are in fact regular business records is not — as the trial court advised the jury — a matter going only to weight of the evidence; other circumstances of the making of the records may go to weight once the threshold requirements for admissibility are met (CPLR 4518 [a]).
 Initially, neither the fact that records are those of a criminal enterprise, nor the fact that the alleged enterprise is a one-man business, disqualifies them from consideration as business records within CPLR 4518 (a).
The statute itself provides that "[t]he term business includes a business, profession, occupation and calling of every kind.” The Legislature’s broad definition of "business” embraces a wide range of enterprises, entities and groups where records are regularly kept and there is a dependence on the accuracy of those records (see, 5 Weinstein-Korn-Miller, NY Civ Prac If 4518.15). While this court has not previously determined whether records of a criminal enterprise can ever be considered "business records” within the contemplation of the statute, the Legislature did not foreclose that application. It is certainly conceivable that a criminal enterprise, like any other, could maintain its records with such regularity and method as to leave no doubt of their accuracy and trustworthiness as business records.
While new for us, the question whether records of a criminal enterprise can ever be business records admissible as a hearsay exception has long been answered in the affirmative by the Federal courts, applying definitions of "business” similar to the CPLR definition (see, Fed Rules Evidence rule 803 [6] [in 28 USC Appendix]; 28 USC § 1732). As the Federal courts have recognized, "[t]he principles of efficient accounting apply just as readily to an illicit enterprise as they do to a licit business.” (United States v Baxter, 492 F2d 150, 164, cert denied 416 US 940; see also, United States v Foster, 711 F2d 871, 882, cert denied 465 US 1103; United States v Hedman, 630 F2d 1184, 1198, cert denied 450 US 965; United States v Cohen, 384 F2d 699; United States v Re, 336 F2d 306, 313, cert denied 379 US 904; United States v Quick, 128 F2d 832; Arena v United States, 226 F2d 227, 234, cert denied 350 US 954.) *577 Where the foundation requirements of CPLR 4518 (a) are satisfied, the fact that the records may be those of a criminal enterprise is itself of no consequence.
By the same token, the fact that business records are those of a sole proprietor, or that their intended purpose may be for internal use rather than display to third parties or filing with government agencies, is not disqualifying. So long as the writings do not record purely personal acts or events, but are made in the course of some "business” in accordance with statutory requirements, there is no basis for excluding the private records of a one-man business from the ambit of CPLR 4518 (a) (see, 5 Weinstein-Korn-Miller, NY Civ Prac ][ 4518.16; Fisch, New York Evidence § 833 [2d ed]).
Finding no categorical impediment to accepting the diaries of a loanshark as business records within CPLR 4518 (a), we proceed to a consideration whether in this case there was sufficient foundation for their admission, and conclude that there was not.
The focus of the People’s argument is on the issue of the foundation witness.[4] In particular, the People urge that the foundation witness need not be the custodian of the records, or even an employee of the business, but can be an expert witness.
While the Federal business records rule requires that a foundation be "shown by the testimony of the custodian or other qualified witness” (Fed Rules Evidence rule 803 [6]), CPLR 4518 (a) is silent as to who, if anyone, must introduce a business record, and the issue is without controlling precedent in our case law.[5] Recognizing that business records are customarily offered through a custodian or employee, the People *578 nonetheless contend that resolution of this novel issue should be guided by the principle that the business records exception has consistently been expanded by the Legislature and is liberally applied by this court (citing Kelly v Wasserman, 5 NY2d 425), and that an expert can, as well as any other witness, be someone with knowledge of the particular record-keeping procedures of the maker of the record (Blair v Martin’s, 78 AD2d 895; see also, Sabatino v Turf House, 76 AD2d 945, 946; Matter of Brown v Murphy, 43 AD2d 524; 4 Weinstein, Evidence 803 [6] [02]). Whether an expert witness could, in any situation, furnish the necessary foundation for admission of business records is an issue we need not and do not decide, for here it is plain that the testimony of Emanuelo was insufficient for that purpose.
The present statute, like its predecessor (Civ Prac Act § 374-a), traces its ancestry both to the common-law "shop book” rule, permitting merchants (disqualified from serving as their own witnesses) to authenticate their books of account as evidence of debts owing to them, and to the common-law regular entries rule, admitting entries made in the regular course of business by a clerk since deceased. In this State, over the years a mass of petty technicalities had sprung up to block admission into evidence of plainly trustworthy business records which were accepted and relied on in daily commercial dealings as accurate accounts. The legislative purpose in enacting Civil Practice Act § 374-a in 1928 was to permit such records to be received in evidence without the need to call as witnesses all the individuals who made them. (For the history of the statute see, Johnson v Lutz, 253 NY 124; Murray v Donlan, 77 AD2d 337; Richardson, Evidence §§ 294-296 [Prince 10th ed]; Fisch, New York Evidence § 831 [2d ed]; see generally, 5 Wigmore, Evidence §§ 1517, 1561a [Chadbourn rev 1974]; 4 Weinstein, Evidence fl 803 [6] [01].) Since that enactment nearly 60 years ago, the statutory exception to the hearsay rule has widened considerably, both as business and record-keeping have become increasingly complex and sophisticated. The business records exception has been recognized as probably the most important hearsay exception, and a major growth point in the law with great potential for further expansion (5 Weinstein-Korn-Miller, NY Civ Prac [HI 4518.01, 4518.02).
While the concept of "business” has ventured far beyond the mercantile origins of this hearsay exception, and records in forms previously unimagined are now routinely received in *579 evidence pursuant to CPLR 4518 (see, e.g., Guth Realty v Gingold, 34 NY2d 440), still not every record máde in business falls within the exception. Courts must surely be sensitive to innovation and not seize on petty irregularities to exclude otherwise trustworthy evidence, but there is also the countervailing interest of fairness to the party against whom the records are admitted, and especially so in a criminal case, where the accused has a constitutional right of confrontation (see, Ohio v Roberts, 448 US 56, 66). The particular force of documents which are not subject to cross-examination, and which may be taken into the jury room (as the pocket diaries were in the present case), cannot be ignored. However flexibly or liberally they may be viewed, the purpose and requirements of the statute remain the touchstone.
As with other hearsay exceptions, the business records exception grew out of considerations of necessity and trustworthiness — the necessity for alternatives to permit large and small businesses to prove debts by their records of account, and the unusual degree of trustworthiness and reliability of such records owing to the fact that they were kept regularly, systematically, routinely and contemporaneously (5 Wigmore, Evidence §§ 1421, 1422, 1546 [Chadbourn rev 1974]; see also, Note, Business Records Rule: Repeated Target of Legal Reform, 36 Brooklyn L Rev 241). The element of unusual reliability is supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation (McCormick, Evidence § 306 [Cleary 3d ed]). The essence of the business records exception to the hearsay rule is that records systematically made for the conduct of a business as a business are inherently highly trustworthy because they are routine reflections of day-to-day operations and because the entrant’s obligation is to have them truthful and accurate for purposes of the conduct of the enterprise (see, Williams v Alexander, 309 NY 283, 286).
These concepts appear as the foundation requirements of CPLR 4518 (a): first, that the record be made in the regular course of business — essentially, that it reflect a routine, regularly conducted business activity, and that it be needed and relied on in the performance of functions of the business; second, that it be the regular course of such business to make the record (a double requirement of regularity) — essentially, that the record be made pursuant to established procedures *580 for the routine, habitual, systematic making of such a record; and third, that the record be made at or about the time of the event being recorded — essentially, that recollection be fairly accurate and the habit or routine of making the entries assured.
The People did not establish a sufficient foundation for the two pocket diaries as business records. The fact that Emanuelo recited only that the diaries were the type of records kept in the ordinary course of a usury business, without also testifying in haec verba that it was the regular course of such business to make these records, is not determinative; the fact that his testimony — the only evidence offered of the regularity of the diaries — failed to meet these standards, is.
Even assuming that the testimony established that the records were kept in a criminal usury business, it did not indicate that they were made by their author (or authors, whoever they might be) pursuant to an established procedure for the routine, habitual, systematic making of records that would qualify them as trustworthy accounts. Nor did the testimony establish that these pocket diaries were the records regularly relied on in the business. That diaries may have been kept to record certain transactions in a business is insufficient. All records are presumably made to keep track of events, transactions or occurrences, but only those meeting the statutory requirements may be admitted in evidence.
Not only were the requisite regularity and unusual reliability of the diaries as business records not shown as a foundation on direct examination, but also the converse emerged on Emanuelo’s cross-examination:
"Q Would you say that it was the norm for the keeper of these books to write in code name or would you say it was normal for the keeper of the books to keep a set of books like you did when you were working undercover?
"A It’s hard to say. The answer to that would be no. Each usurer uses his own record keeping. We never really got everybody’s master records out of sixty-five or better arrests that we made. We didn’t come up with everybody’s master record. Some of them were worksheets that would come up with physical evidence. The norm would be — it’s really hard to say. Each individual operation is normally separate and distinct.
"Q Did the money lender keep the paperwork on, I presume, disposable paper?
*581 "A The money lender? No. You never put it on inflammable paper. That’s your whole ball game. You lose this and it’s all over. Your action is gone.
"Q Your action is gone?
"A Your action is gone.
"Q So that each money lender kept books in his own style, in his own fashion?
"A Yes, sir.
"Q If he had a code, it was a code known to him?
"A Yes, sir.”
Similarly, with respect to the time entries were recorded in the diaries, the expert’s testimony failed to establish a regular, methodical, systematic practice, and indeed his further testimony betrayed the converse:
"Q Do you have an opinion as to why there are entries and no payments reflected?
"A I feel that Frank prepaid. He knew he wasn’t going to pay those particular weeks, so he gave him $750 which picked up maybe 2 weeks and another $750 he prepaid.
"Q Well, do you have an opinion as to why Frank is written in there at all?
"A Well, throughout the book the usurer seems to predate his people that he is going to meet. In other words, he will take the book and I don’t know exactly how he did it, but he took the book and jotted down the name Frank five times. He knows he’s got to meet him 5 weeks. And after that fifth time he jots down his name 5 times and he seems to have done that throughout the entire book.” (Emphasis added.)
* * *
“A It appears that what he did was predate his book.
"Q You don’t know exactly how he did it?
"A No.
"Q You didn’t know why he did it?
"A No, I wouldn’t know why he did it.”
Obviously, the regularity and trustworthiness of books of account of a criminal enterprise (or, indeed, any enterprise) need not be tested by compliance with generally accepted accounting principles. More, however, is required by way of foundation than an expert’s view that, because usurers personally and cryptically maintain records of what is collected, *582 paid and owed, two pocket diaries identified as a usurer’s record are "business records” admissible in evidence against a third person for the truth of their contents.
Finally, defendant urges that the conspiracy count on which he was convicted should have been dismissed because three of the six overt acts alleged were legally insufficient. No such challenge having been raised below by timely motion to dismiss the indictment, there is no issue of law presented for our review (see, CPL 470.35 [2] [b]).
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Wachtler and Judges Meyer, Simons, Alexander, Titone and Hancock, Jr., concur.
Order affirmed.

. Manuli did not testify. While he was charged both with defendant and also separately in two additional indictments, at the time of defendant’s trial he had pleaded guilty to the crime of criminal possession of a controlled substance in the third degree and was awaiting sentence (see, People v Manuli, 104 AD2d 386).

. CPLR 4518 (a) reads: "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible in evidence in proof of that act, transaction, occurrence or event, if the judge finds that it was made in the regular course of any business and that it was the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter. All other circumstances of the making of the memorandum or record, including lack of personal knowledge by the maker, may be proved to affect its weight, but they shall not affect its admissibility. The term business includes a business, profession, occupation and calling of every kind.”

. Appellant now urges that admission of the diaries should be sustained, if not under CPLR 4518 (a), then as statements of a coconspirator made in furtherance of the conspiracy. No such argument was made before the trial court, and it cannot be considered here (see, People v Nieves, 67 NY2d 125, 131).

. No contention is made that the diaries are so patently trustworthy as to be self-authenticating, with no need for a qualifying witness; from our own review of the two little notebooks, it is apparent that such a contention could not seriously be made. Nor do the People contend that the requirements for qualification of the diaries as business records were satisfied by other evidence apart from the expert testimony (see, Zenith Radio Corp. v Matsushita Elec. Indus. Co., 505 F Supp 1190, 1233-1236, revd in part on other grounds sub nom. In re Japanese Elec. Prods. Antitrust Litig., 723 F2d 238, revd on other grounds 475 US —, 106 S Ct 1348; see also, 4 Weinstein, Evidence fl 803 [6] [02]; Proposed New York Code of Evidence § 803 [c] [5]).

. We note that in the Federal criminal cases relied upon by the People, the records were generally introduced by a custodian, an employee or similarly situated person, or their own author, never by an expert witness (see, e.g., United States v Hedman, 630 F2d 1184; United States v McPartlin, 595 F2d 1321, cert den 444 US 833; United States v Baxter, 492 F2d 150).