■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RASHAD SCOTT, Also Known as MACK, Appellant. [742 NYS2d 681] —Spain, J. Appeal from a judgment of the County Court of Schenectady County (Eidens, J.), rendered May 13, 1999, upon a verdict convicting defendant of the crimes of murder in the second degree (two counts), robbery in the first degree (four counts), robbery in the second degree, burglary in the first degree (four counts), assault in the first degree, assault in the third degree and conspiracy in the fourth degree.

After a jury trial, defendant was convicted of two counts of murder in the second degree (depraved indifference and felony murder) and numerous related crimes for his participation in the May 12, 1997 break-in of the home of Richard Vale in the City of Schenectady, Schenectady County, during which Sheryl Toyloy, who resided with Vale, was killed. James Young, one of the three participants in these crimes, testified at trial pursuant to a cooperation agreement that he, defendant and Patrick Jeanty, who all knew one another and were involved in drug selling, participated in the plan to rob Vale's combination safe located in his basement.

Young testified that earlier in the day while Vale was at work, Jeanty had gone to Vale's residence to visit Toyloy, with whom Jeanty had a drug-related relationship, and deliberately left a first floor window open when he left. Later that day, the trio returned and initially defendant, the only one of the three who Toyloy did not know, wearing a mask and gloves, entered the home through the window and was surprised by Toyloy who was coming down the stairs from the second floor. Defendant subdued Toyloy, covered her head with a blanket and then opened the front door allowing Young and Jeanty, waiting outside, to enter. Upon entering, Young observed defendant kneeling on the back of Toyloy, who was face down and not moving, near the front door. Defendant told them that Toyloy had screamed and resisted, causing him to "put her to sleep." Jeanty and Young tied Toyloy's wrists and ankles and tied the blanket around her head and she was moved to a less visible area of the house. Toyloy was not again seen moving and, when Young later checked on her, he determined that she had no pulse and had died. A subsequent autopsy revealed that she had died of asphyxiation. Toyloy's two-year-old child was present in the home during the entire crime spree.

The trio then awaited Vale's return from work several hours later and, upon his entry into his home, they ambushed him, repeatedly beat him causing serious injuries, handcuffed him and extracted the combination to his safe. Unable to open it, they forced Vale to open it and stole its contents, consisting of cash and coins valued at approximately $800. They gagged and bound Vale and fled, dividing the proceeds. Vale was able to free himself, at which time he went to a neighbor's house for help and was then transported via ambulance for emergency medical treatment. Key aspects of Young's testimony were corroborated by, inter alia, various physical evidence, two of defendant's friends who testified that defendant told them of his involvement, and the testimony of defendant's girlfriend.

Upon his conviction, defendant was sentenced to an aggregate indeterminate prison term of 63⅚ years to life. Jeanty's judgment of conviction after a separate trial for felony murder and related crimes was affirmed by this Court (*People v Jeanty*, 268 AD2d 675, *lv denied* 94 NY2d 949). Defendant now appeals, arguing that various evidentiary errors and the prosecutor's comments upon summation deprived him of a fair trial. Upon close inspection, we find that none of his claims has merit.

Among defendant's claims that evidentiary errors occurred which deprived him of a fair trial, he contends that County Court erred in admitting into evidence a photograph of Toyloy and her two-year-old daughter taken prior to these crimes. The photograph was later used by witnesses for identification purposes and was relevant, inter alia, to establish the relative age and appearance of the murder victim and her child, who was present in the house throughout the ordeal but was too young to testify. We perceive no abuse of discretion in this ruling, which was succeeded by multiple admonitions to the jury (*see, People v Stevens*, 76 NY2d 833, 835-836; *cf., People v Dove*, 233 AD2d 751, 754, *lv denied* 89 NY2d 1011). With regard to defendant's objection to the introduction into evidence of the authenticated Mohawk Ambulance Service Records, i.e., a report pertaining to the emergency care provided to Vale, the testimony of the paramedic who participated—along with his partner who had prepared the report—in the treatment of Vale near the crime scene established the requisite foundation for the admission of this report under the business records exception to the hearsay rule (*see, People v Cratsley*, 86 NY2d 81, 89; *People v Kennedy*, 68 NY2d 569, 578-580; *People v Bailey*, 252 AD2d 815, 815-816, *lv denied* 92 NY2d 922; *see also*, CPLR 4518 [a]; CPL 60.10). Testimony from the author of the report was not a prerequisite to its admission under this exception (*see, People v Cratsley, supra* at 88-91).

Likewise, County Court properly overruled defense counsel's general objection to the testimony of the emergency room physician who treated Vale immediately upon his arrival at the hospital. The physician testified to the history he obtained from Vale, including his account that he had been assaulted and robbed, and such testimony established that this history was patently germane to his treatment and diagnosing of Vale's life-threatening injuries (*see, People v Thomas*, 282 AD2d 827, 828, *lv denied* 96 NY2d 925; *Scott v Mason*, 155 AD2d 655, 657). Defense counsel expressly declined to object to the introduction of Vale's resulting hospital records subject to

redaction and, in any event, they were similarly properly received (*see, People v Cratsley, supra* at 88-89).

We also find lacking in merit defendant's argument that County Court erred in permitting several expert witnesses to offer explanatory information regarding the results of forensic tests performed on evidence in this case, and regarding the absence of physical evidence linking defendant to this crime. Testimony from a city police evidence technician and a State Police forensic analyst established that, among the three participants, only the fingerprint of Jeanty was lifted from the house; they were permitted to explain some of the reasons why fingerprints may be absent from surfaces despite having been handled, although they were not permitted to state their statistical success in lifting prints from crime scenes. On cross-examination, defense counsel emphasized the absence of fingerprint or other physical evidence connecting defendant to the crime scene. The forensic pathologist who performed the autopsy of Toyloy and took scrapings from beneath her fingernails, which were not conclusive, testified—over defense counsel's objection premised upon the "form" of the question— why it was extremely uncommon to find blood or tissue from another individual in such scrapings, a point explored by defense counsel on cross-examination. Under these facts, we perceive no abuse of discretion in the court's rulings pertaining to the permissible scope of this expert testimony (*see, People v Johnston*, 273 AD2d 514, 517-518, *lv denied* 95 NY2d 935; *see also, People v Taylor*, 75 NY2d 277, 288).

Defendant raises a related claim that he was unfairly surprised and prejudiced by the prosecutor's introduction of testimony concerning the results of the previously requested but not completed DNA testing of the fingernail scrapings* taken from Toyloy, which results were first obtained by the prosecutor during the trial. The introduction of the testimony from the People's DNA expert was delayed for five days allowing the defense time to prepare for it, and County Court provided defendant with an opportunity for a continuance to obtain his own expert or to request independent tests. Notably, no discovery violation is alleged and the defense was on notice long before trial that the scraping evidence existed and had

---

* The test results showed that the scrapings from Toyloy's right hand were a mixture of DNA from different people and neither Toyloy, Vale nor the three participants could be excluded, nor could practically anyone in the general population. Tests on the scrapings taken from Toyloy's left hand also reflected DNA from multiple individuals, and excluded Toyloy, Vale, Jeanty and Young, but could not exclude defendant or 50% of the general population.

been submitted to the lab but not yet tested, and no claim of denial of access to this evidence is raised. We find that the admission of this testimony did not deprive defendant of a fair trial, and that he was not unfairly prevented from preparing his defense (*see, People v Montelbano*, 232 AD2d 255, *lv denied* 89 NY2d 944; *see also, People v Greene*, 262 AD2d 962, *lv denied* 94 NY2d 823).

We are similarly unpersuaded by any of defendant's remaining claims. The audiotape recording of the telephone call received by Toyloy the day of her murder was relevant in that it established the relationship and contact between her and Jeanty that day and the time she was known to be alive (*see, People v Weyant*, 68 AD2d 608, 613). Further, the testimony of Vale which defendant claims was improper or inflammatory was, in fact, properly admitted as brief background information explaining, among other facts relevant to these crimes, Toyloy's drug addiction, Vale's taping of phone calls and other household practices pertaining to Toyloy, and his account of the attack. With regard to defendant's contention that County Court unfairly curtailed defense counsel's cross-examination of a key witness, Donald Notice, no abuse of discretion is evident (*see, People v Ocasio*, 47 NY2d 55, 60; *People v Provenzano*, 79 AD2d 811, 813-814). Notice testified that he and defendant had been friends and that defendant admitted committing these crimes, which defendant recounted to him. Notice testified on direct and cross-examination that he was cooperating with the District Attorney pursuant to a cooperation agreement in which he would receive a reduced sentence on an unrelated pending criminal sale of drugs charge to which he had pleaded guilty. After Notice was impeached at length on cross-examination regarding the cooperation deal and his account of defendant's admission to him, the court sustained the prosecutor's objection to defense counsel's argumentative question, "And that's what you're telling us in order to get your deal?," a point already clearly made by the cross-examination. In our view, this ruling represented a reasonable, isolated limitation on the scope of this cross-examination.

Finally, to the extent that defendant argues that County Court's curative instruction was insufficient to alleviate the prejudice caused by the prosecutor's comment in summation, which defendant argues caused the jury to speculate why he lacked an alibi, we do not agree. In summation, the prosecutor addressed at length the risk faced by Young of being detected as a liar and thereby breaching the cooperation agreement if he were discovered to have fabricated his account of defendant's

involvement in these crimes, as the defense had argued. The prosecutor made the point in the form of a rhetorical question that if Young's version of defendant's role were false, what if defendant "could come up with an alibi * * * for that night?" The court sustained defendant's objection to this comment and, at the outset of its charge, directed the jury to "disregard any reference to the notion or concept of an alibi * * * [as] improper." In context, the prosecutor's single remark was a fair comment on the trial evidence and in response to the defense theory that Young fabricated defendant's participation in this crime spree, and bore on the legitimate issue of the credibility of Young's testimony (see, People v Ashwal, 39 NY2d 105, 109-110; People v Mensche, 276 AD2d 834, 837, lv denied 95 NY2d 966). It did not suggest an obligation to produce an alibi or focus on defendant's failure to testify (see, People v Codrington, 109 AD2d 891; cf., People v Brewer, 94 AD2d 812, 813), and the curative instruction minimized the potential prejudice.

We have reviewed defendant's remaining contentions and conclude that none requires disturbing the judgment of conviction.

Mercure, J.P., Crew III, Peters and Lahtinen, JJ., concur. Ordered that the judgment is affirmed.

