People v Montes (2019 NY Slip Op 09324)





People v Montes


2019 NY Slip Op 09324


Decided on December 26, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: December 26, 2019

110491

[*1]The People of the State of New York, Respondent,
v
Germaine Montes, Appellant.

Calendar Date: November 15, 2019

Before: Egan Jr., J.P., Clark, Devine and Aarons, JJ.


Carolyn B. George, Albany, for appellant, and appellant pro se.
P. David Soares, District Attorney, Albany (Emily Schultz of counsel), for respondent.



Egan Jr., J.P.
Appeal from a judgment of the County Court of Albany County (Carter, J.), rendered August 1, 2018, upon a verdict convicting defendant of the crime of criminal possession of a forged instrument in the second degree (three counts).
On April 11, 2017, defendant was charged by sealed indictment with three counts of criminal possession of a forged instrument in the second degree based upon allegations that, on three separate occasions, he knowingly deposited a forged check into another individual's bank account. Defendant was arrested and arraigned on the indictment on November 8, 2017. He thereafter filed an omnibus motion seeking to, among other things, dismiss the indictment for violation of his statutory right to a speedy trial pursuant to CPL 30.30 and suppress any pretrial identifications. Following two separate hearings, County Court denied defendant's speedy trial motion, finding that the police had exercised due diligence in attempting to locate defendant following the unsealing of his indictment, and denied the suppression of any pretrial identifications of defendant on the ground that said identifications were merely confirmatory. Following a jury trial, defendant was convicted as charged and he was thereafter sentenced, as a predicate felony offender, to a prison term of 2 to 4 years on each count, with the sentences on the first two counts to be served consecutively to one another and concurrently with the sentence imposed on the third count, for a total prison term of 4 to 8 years. Defendant appeals.
Defendant initially contends that his convictions were not supported by legally sufficient evidence and were against the weight of the evidence insofar as the People failed to prove that he knowingly possessed the subject forged checks. "When conducting a legal sufficiency analysis, we view the evidence in the light most favorable to the People and evaluate whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v Glover, 160 AD3d 1203, 1204 [2018] [internal quotation marks and citations omitted]). As relevant here, to be found guilty of criminal possession of a forged instrument in the second degree, the People were required to prove that defendant uttered or possessed the subject forged instruments "with knowledge that [they were] forged and with intent to defraud, deceive or injure another" (see Penal Law § 170.25). To that end, "guilty knowledge of forgery may be shown circumstantially by conduct and events, and evidence of an intent to defraud or deceive may be inferred from a defendant's actions and surrounding circumstances" (People v Gretzinger, 164 AD3d 1021, 1022 [2018] [internal quotation marks, brackets and citations omitted]; see People v Johnson, 65 NY2d 556, 561 [1985]).
Here, the evidence introduced at trial established that defendant approached three separate individuals on three separate dates in November 2014, January 2015 and March 2015 and requested that each open a bank account at a particular bank and provide him with the corresponding account information and documentation (i.e., bank starter packet, debit card, pin number and/or starter checks). In return for opening the account and turning over their account documentation, defendant gave each individual cash and/or gift cards and/or merchandise that he purchased on their behalf. The bank records for each individual's account show that, shortly after defendant procured their account information, a forged check was deposited into each of the accounts via an ATM deposit. In the days following each ATM deposit, a number of balance inquiries were made on each account and, once the subject funds became accessible, a succession of ATM withdrawals and/or other large purchases and/or payments would be made from each respective account. Each of the three individuals testified that they had no knowledge of any such check being deposited into the account and they had not personally deposited any such check, nor did they affix a signature or otherwise recognize the signature that was endorsed thereon.
A senior investigator for the bank in which all three accounts were opened reviewed the bank records for these accounts, as well as video surveillance footage, which established that none of the three individuals who opened the subject bank accounts was the same person who subsequently made the three ATM deposits. Photographs from the ATMs where each of the three deposits were made clearly identified defendant as the individual who made the deposits. Moreover, the date of each photograph directly corresponds with the bank records indicating the date on which each of the subject deposits were made into the three individuals' bank accounts. Viewing the evidence in a light most favorable to the People, we find that sufficient evidence was presented at trial from which a jury could reasonably infer that defendant knowingly procured the three individuals' bank account information with the intent of defrauding the subject bank and thereafter knowingly possessed and deposited three forged checks into the subject individuals' accounts for the same fraudulent purpose. Accordingly, we find that the People presented legally sufficient evidence to support defendant's convictions for criminal possession of a forged instrument in the second degree. Additionally, although another verdict would not have been unreasonable, viewing the evidence in a neutral light and giving deference to the jury's credibility determinations, we are satisfied that the verdict is not against the weight of the evidence (see People v Danielson, 9 NY3d 342, 348 [2007]; People v Gretzinger, 164 AD3d at 1023; People v Hold, 101 AD3d 1692, 1693 [2012], lv denied 21 NY3d 1016 [2013]).
We reject defendant's contention that County Court erred when it denied his statutory speedy trial motion. Inasmuch as defendant was charged with three felony counts, the People were required to be ready for trial within six months (see CPL 30.30 [1] [a]). "In computing the time within which the People must be ready for trial, the court must exclude the period of delay resulting from the absence or unavailability of the defendant" (People v Hawkins, 130 AD3d 1298, 1300 [2015] [internal quotation marks and citations omitted], lv denied 26 NY3d 968 [2015]; see CPL 30.30 [4] [c] [i]). As relevant here, "[a] defendant must be considered absent whenever his [or her] location is unknown and he [or she] is attempting to avoid apprehension or prosecution, or his [or her] location cannot be determined by due diligence" (CPL 30.30 [4] [c] [i]; see People v Flagg, 30 AD3d 889, 891 [2006], lv denied 7 NY3d 848 [2006]). Importantly, "[t]he determination of whether the People have exercised due diligence in locating a person is a mixed question of law and fact and while minimal attempts to locate a defendant and secure his or her presence in court will not satisfy the due diligence standard, the police are not obliged to search for a defendant indefinitely as long as they exhaust all reasonable investigative leads as to his or her whereabouts" (People v Hawkins, 130 AD3d at 1300 [internal quotation marks, brackets and citations omitted]; see People v Devino, 110 AD3d 1146, 1148-1149 [2013]).
It is undisputed that six months and 27 days elapsed between the April 11, 2017 unsealing of defendant's indictment and his subsequent apprehension and arraignment on November 8, 2017.[FN1] The evidence introduced at the CPL 30.30 hearing demonstrated that the People met their burden of establishing that the police exercised due diligence in attempting to apprehend defendant following his indictment but before his arrest. A State Police investigator testified that, upon issuance of the arrest warrant, he entered it into a statewide portal and directed a state trooper to assist him in locating defendant. The investigator and the trooper then attempted to locate defendant at his mother's address on Morton Avenue in the City of Albany and surveilled that address for a period of time without success. The state trooper also spoke with both defendant's father and the father's ex-girlfriend and was informed that defendant did not reside at either of those addresses nor did they know his current whereabouts. Unable to locate defendant, in May 2017, the investigator notified the Albany Crime Analysis Center and the United States Marshals Service of defendant's warrant. Throughout the summer of 2017, the assigned state trooper continued to patrol Morton Avenue looking for defendant "[a]t least a few times a month," the investigator personally looked for or made inquiry into defendant's whereabouts approximately 20 times and officers with the City of Albany Police Department separately checked various addresses and patrolled Morton Avenue at least a dozen times specifically looking for defendant.
Notably, on July 30, 2017, Albany police responded to a fire call at the apartment of defendant's mother and confirmed that defendant was residing at that address. In September 2017, the investigator contacted the Albany Housing Authority — which controlled the building where the mother's apartment was located — to ascertain if defendant had been seen in the area. They also staked out that location on multiple occasions in September, October and November 2017, ultimately apprehending defendant on November 8, 2017 after observing him exit the subject apartment building. Although the investigator and assigned trooper did not document each and every attempt that they made to find defendant during the subject time period, "it cannot be said that the authorities shirked their continuing obligation of due diligence" (People v Hawkins, 130 AD3d at 1301 [internal quotation marks and citations omitted]). Accordingly, given the testimony adduced at the hearing, we find that the People sufficiently established that more than 27 days of time were excludable given the reasonable efforts made by multiple police agencies to locate defendant and, therefore, defendant's statutory right to a speedy trial was not violated (see CPL 30.30; People v Hawkins, 130 AD3d at 1301).
Next, defendant contends that County Court erred when it denied his motion for a mistrial on the ground that one of the trial jurors was grossly unqualified to serve pursuant to CPL 270.35. We disagree. Pursuant to CPL 270.35, "[i]f at any time after the trial jury has been sworn and before the rendition of its verdict, . . . the court finds, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve in the case or has engaged in misconduct of a substantial nature . . . the court must discharge such juror" (CPL 270.35 [1]). A juror is considered grossly unqualified to serve "when it becomes obvious that [he or she] possesses a state of mind which would prevent the rendering of an impartial verdict" (People v Kuzdzal, 31 NY3d 478, 483 [2018] [internal quotation marks and citation omitted]; accord People v Reichel, 110 AD3d 1356, 1358 [2013], lv denied 22 NY3d 1090 [2014]). As the trial court is in the best position to observe the jury and assess the state of mind and alleged partiality of an allegedly biased juror, its determination as to whether a juror is grossly unqualified to serve is entitled to great deference (see People v Kuzdzal, 31 NY3d at 485; People v Spencer, 29 NY3d 302, 310 [2017]; People v Crider, 176 AD3d 1499, 1500 [2019]).
Here, the jury commenced deliberations at approximately 3:00 p.m. on Friday, June 1, 2017 and was then excused for the weekend at approximately 5:00 p.m. Jury deliberations resumed on Monday, June 4, 2017 and, at approximately 10:00 a.m., County Court received a note indicating that juror No. 5 "would like to talk to [the court] before the [jury rendered its] verdict." In a colloquy in chambers, in the presence of counsel and defendant, juror No. 5 thereafter indicated that she felt she was being "attacked" by other jurors and that she did not believe that she was being "taken seriously" and that another juror had "threatened" her Friday afternoon. She further stated that, although she was not physically attacked, she did not "feel safe" or "comfortable" being in the jury deliberation room and did not wish to deliberate any further. Defendant moved for a mistrial, which motion County Court denied. Following additional consultation with counsel, County Court briefly sequestered juror No. 5 from the other jurors while it individually questioned each of the other 11 jurors — in chambers, in the presence of counsel and defendant — regarding the progress and tone of deliberations to that point.[FN2] Following this inquiry, County Court brought the entire jury back into the court room and instructed the jury that deliberations were not intended to be easy but, in conducting same, each juror had to be civil, "respect each other's feelings" and provide "each juror an opportunity to be heard." At 11:17 a.m., the court then directed the jury to return to the jury room to continue deliberating.[FN3]
At approximately 1:40 p.m., County Court received a note from the jury requesting a written copy of certain witness testimony and a new verdict sheet. Although County Court was discussing its response to this note, it received another note from juror No. 5. The note read, in relevant part, "I will not continue to stay in this room when I still remain uncomfortable and not welcomed. You said in your statement that no one should be pressured into changing their opinion and I, under my conscience, cannot do so with the people I have been selected to serve with. There will be no decision with this jury under these circumstances." Based on juror No. 5's note, defendant renewed his motion for a mistrial and County Court again denied the motion. The court then responded to the jury's initial note by providing it with a new verdict sheet and informed it that it could not have a written copy of the requested testimony, but could request a read-back of said testimony; the court did not address juror No. 5's note at that time. At 2:01 p.m., however, the court received another note from the jury indicating that deliberations were on hold pending the court's response to juror No. 5's prior note. Following additional consultation with counsel, County Court called juror No. 5 into the courtroom, outside the presence of the other jurors, and told her that, although it appreciated the fact that jury deliberations could be uncomfortable, she could not simply stop participating because the other jurors disagreed with her opinion and asked to her to "please try and . . . deliberate with your other jurors as best as you can." County Court reiterated that it would be okay if juror No. 5 ultimately disagreed with the rest of the jurors and that she should not change her mind unless she truly believed that she should. The court then directed her to return to the jury room at 2:11 p.m. and thereafter addressed the full jury panel, again stating that the jurors were expected to "respect each other's feelings" and continue to deliberate together. Subsequently, at 3:11 p.m., the court received a note indicating that the jury had reached a verdict on all three counts. Following the jury foreperson's entry of a guilty verdict as to each count, the individual jurors were polled as to each count, and all affirmatively represented that they voted in favor of the guilty verdict on all three counts.
Upon review of the private colloquies between County Court and juror No. 5, as well as the discussions between County Court and the other 11 jurors on the panel, we are not persuaded that juror No. 5 possessed a state of mind that prevented her from rendering an impartial verdict so as to deprive defendant of a fair trial (see People v Buford, 69 NY2d 290, 299 [1987]). Although juror No. 5 initially indicated that she did not wish to continue with deliberations given the initial contentious nature thereof and the fact she did not feel comfortable in the jury room, "a declaration regarding emotions alone does not render a juror grossly qualified" (People v Spencer, 29 NY3d at 311; see People v Marshall, 106 AD3d 1, 10 [2013], lvs denied 21 NY3d 1006, 1007 [2013]; People v Haxhia, 81 AD3d 414, 414 [2011], lv denied 17 NY3d 796 [2011], cert denied 565 US 1204 [2012]). After being notified of juror No. 5's concerns, County Court conducted a "probing and tactful" inquiry of both juror No. 5 and the other members of the jury, instructing them that they were to respect one another's feelings and opinions as they continued their deliberations (People v Kuzdzal, 31 NY3d at 486 [internal quotation marks and citation omitted]). Notably, juror No. 5 did ultimately return to the jury room and did participate in further deliberations with her fellow jurors and at no point in either juror No. 5's notes or her private colloquies with the court did she ever indicate that she would be unable to render an impartial verdict or that she might vote in a certain manner simply to attain a unanimous verdict. Quite the contrary, juror No. 5's second note to the court specifically indicated that she would not reach a decision based solely on the pressure that she may have felt from other jurors to do so. Following a further colloquy with County Court and additional instructions from the court for the jury to continue working collaboratively toward a verdict, upon further deliberations, a unanimous verdict was, in fact, rendered on all three counts. Moreover, upon subsequent polling of the jury, juror No. 5 affirmatively indicated — on three separate occasions — that she voted in favor of defendant's guilt on all three counts (see People v Bailey, 258 AD2d 807, 808 [1999], lv denied 93 NY3d 1001 [1999]). Accordingly, deferring to County Court's ability to observe the jury and assess juror No. 5's emotions, state of mind and alleged partiality, we cannot say that County Court's denial of defendant's motions for a mistrial constituted an abuse of discretion.
Defendant's remaining arguments do not require extended discussion. Defendant's challenges to the underlying grand jury proceeding were not preserved for appellate review as he did not object or otherwise move to dismiss the indictment on the grounds presently raised on appeal (see People v Young, 100 AD3d 1186, 1187 [2012], lv denied 21 NY3d 1021 [2013]; People v Yamagata, 208 AD2d 1120, 1121 [1994]). Additionally, the evidence adduced at the Rodriguez hearing established a sufficient relationship between defendant and the three individuals that opened bank accounts to support County Court's determination that their identifications of defendant were merely confirmatory (see People v Wakefield, 175 AD3d 158, 170-171 [2019]; People v Smith, 137 AD3d 1323, 1327 [2016], lvs denied 28 NY3d 973, 974 [2016]). Lastly, defendant's contention that County Court erred in admitting certain documents into evidence is without merit, as a bank employee testified that he was familiar with the record-keeping practices of the bank and that the subject records were made in the regular course of the bank's business and that it was a regular course of such business to make such records (see CPLR 4518 [a]; CPL 60.10; People v Kennedy, 68 NY2d 569, 579-580 [1986]; People v Gunther, 172 AD3d 1403, 1404 [2019], lv denied 34 NY3d 951 [2019]).
Clark, Devine and Aarons, JJ., concur.
ORDERED that the judgment is affirmed, and matter remitted to the County Court of Albany County for further proceedings pursuant to CPL 460.50 (5).



Footnotes

Footnote 1: At defendant's arraignment, the People declared their readiness for trial.

Footnote 2: Following County Court's inquiry, defendant renewed his motion for a mistrial, which County Court denied.

Footnote 3: At approximately 1:17 p.m., the jury sent another note indicating that it had agreed to a verdict on one count but was deadlocked as to the remaining two counts. County Court called the jury into the courtroom and indicated that it was not ready to accept a partial verdict, provided the jury with a "deadlock charge" and directed it to continue deliberating.